**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CAMARIE MANGUM,
           *Plaintiff-Appellant,*

v.

ACTION COLLECTION SERVICE, INC.,
DBA Action Collection;
BONNEVILLE BILLING &
COLLECTIONS, INC.; CITY OF
POCATELLO; DON FURU,
           *Defendants-Appellees.*

No. 08-35191

D.C. No.
4:05-CV-00507-
BLW

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, District Judge, Presiding

Argued and Submitted
June 2, 2009—Portland, Oregon

Filed August 4, 2009

Before: Diarmuid F. O'Scannlain, Ferdinand F. Fernandez,
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fernandez;
Concurrence by Judge O'Scannlain

**COUNSEL**

DeAnne Casperson, Holden, Kidwell, Hahn & Crapo, P.L.L.C., Idaho Falls, Idaho, for the plaintiff-appellant.

Blake G. Hall, Anderson Nelson Hall Smith P.A., Idaho Falls, Idaho; Todd R. Erikson, Todd R. Erikson, P.A., Idaho Falls, Idaho, for the defendants-appellees.

## OPINION

FERNANDEZ, Circuit Judge:

Camarie Mangum appeals the district court's determination that her action against Bonneville Billing & Collections, Inc. ("Bonneville"), under the Fair Debt Collection Practices Act ("FDCPA")[1], was barred by the statute of limitations[2] and that the discovery rule doctrine could not apply as a matter of law. That led to a grant of summary judgment[3] against her.[4]

Mangum also appeals the district court's determinations that she had not shown a right to relief under 42 U.S.C. § 1983 against the City of Pocatello, Idaho, or Captain Don Furu based upon alleged violations of the FDCPA, the Fair Credit Reporting Act ("FCRA")[5] and a claimed constitutional right to privacy. That led to the grant of a summary judgment on the claims based upon the statutes, and a judgment as a matter of law[6] on the claim based upon the right of privacy. We affirm as to the City and Furu, but reverse as to Bonneville.

---

[1]15 U.S.C. §§ 1692-1692p.

[2]15 U.S.C. § 1692k(d).

[3]Fed. R. Civ. P. 56.

[4]We note that Mangum also named other parties, for example, Action Collection Services, Inc., but those parties are not before us on appeal.

[5]15 U.S.C. §§ 1681-1681x.

[6]Fed. R. Civ. P. 50(a).

BACKGROUND

Mangum was a dispatcher for the City, who began work in November 1998, and was terminated on August 1, 2006. On December 2, 2004, Chief of Police Edward Guthrie was at a store in Pocatello, Idaho, where he observed a list containing names of individuals from whom checks would no longer be accepted. Mangum's name was on the list. Subsequently, Chief Guthrie directed Captain Furu to conduct an internal investigation to determine why Mangum's name was included on the list, and to assess whether Mangum was engaged in conduct that violated department policies relating to moral conduct and professional image.

As part of his investigation, Furu examined small-claims-court-actions files that contained copies of prior bad checks written by Mangum. On December 7, 2004, Furu also contacted collection agencies Bonneville and Bannock Collections, Inc. to inquire about possible claims they may have had against Mangum for writing bad checks. On December 8th, 2004, Bonneville provided Furu with copies of insufficient-fund checks written by Mangum. Furu's investigation indicated that Mangum had written at least twenty-six checks with insufficient funds, including one to the City itself.

On December 9, 2004, Furu notified Mangum by letter that he had initiated his investigation, and on December 15, 2004, Mangum attended an investigative interview with Furu in which she first became aware of the fact that the debt collection agencies had provided copies of her check information to Furu. Mangum states that she never gave those agencies permission to release her debt information to third parties. By December 19, 2004, Mangum had hired an attorney regarding the incident.

On December 14, 2005, Mangum finally filed a complaint in the United States District Court for the District of Idaho and asserted causes of action under the FDCPA, the FCRA,

and 42 U.S.C. § 1983. On August 15, 2006, Mangum filed an amended complaint adding § 1983 claims against Captain Furu. All parties then filed motions for summary judgment. The district court dismissed Mangum's FDCPA claim against Bonneville on statute of limitations grounds, and dismissed her FCRA claims against Bonneville on the ground that it was not an entity against whom the FCRA could be asserted. The district court denied the City's motion for summary judgment as to Mangum's § 1983 claim based on constitutional grounds. However, it dismissed Captain Furu on the ground that he was entitled to qualified immunity.

Mangum next filed a motion for reconsideration and requested that the district court address her § 1983 claims based on the purported FCRA and FDCPA violations. The district court denied her motion for reconsideration and concluded that neither the FCRA nor the FDCPA provided a right that she could pursue under § 1983. The parties then proceeded to trial on the right of privacy claim, and at the close of Mangum's evidence, the City filed a motion for judgment as a matter of law. The district court granted that motion and entered judgment in favor of the City on the same day. This appeal followed.[7]

## JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's order granting summary judgment de novo. *Aguilera v. Baca*, 510 F.3d 1161, 1167 (9th Cir. 2007). "An order granting summary judgment will only be affirmed if the evidence, read in the light most favor-

---

[7]It is unclear whether Mangum intends to appeal the judgment in favor of Captain Furu. In all events, what we say as to her claims against the City applies to him as well.

able to the non-moving party, demonstrates the absence of a genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Id.*

We also review the district court's order granting a motion for judgment as a matter of law under Fed. R. Civ. P. 50 de novo. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008). " 'Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion.' " *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002)). That is, " '[a] motion for judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party's favor.' " *Id.*

## DISCUSSION

As we see it, the principal issue with which we must wrestle is whether our usual discovery rule jurisprudence can apply to the statute of limitations for an FDCPA action. We will, therefore, take up that question first and will thereafter consider Mangum's claims against the City under § 1983.

### A.    *FDCPA and the Discovery Rule*

**[1]** The statute of limitations for FDCPA actions is found at 15 U.S.C. § 1692k(d), which, with its heading, reads as follows: "Jurisdiction: An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs." That phraseology, says Bonneville, with little discussion, means that the time for bringing an action is an element of subject matter jurisdiction. Were that so, equitable tolling could not apply.[8] *See Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89,

---

[8]The discovery rule is not the same as equitable tolling. *See Garcia v. Brockway*, 526 F.3d 456, 465 (9th Cir. 2008) (en banc). However, because

93-95, 111 S. Ct. 453, 456-57, 112 L. Ed. 2d 435 (1990); *Marley v. United States*, 548 F.3d 1286, 1290 (9th Cir. 2008). However, there is an operating presumption that "equitable tolling [is] applicable to suits against private defendants," a presumption that also applies to "suits against the United States." *Irwin*, 498 U.S. at 95-96, 111 S. Ct. at 457. Of necessity, that must mean that statute of limitations provisions will not be seen to be jurisdictional in character, absent some significant indication to the contrary in the statutory language or in the legislative history. Bonneville points to no such language or history; nor have we found any.[9]

[2] Of course, there is the heading "Jurisdiction" in 15 U.S.C. § 1692k(d), but the statute itself does not have that heading,[10] and the mere fact that the Office of the Law Revision Counsel[11] chose to create the heading when it codified the provision does not affect our decision. There can be little doubt that titles, in general, are of some help,[12] but the mere

it does not matter here, we will assume, without deciding, that the discovery rule could not apply either, if the time limitation was jurisdictional. *See Archer v. Nissan Motor Acceptance Corp.*, 550 F.3d 506, 508 (5th Cir. 2008) (stating where time limitation was a jurisdictional bar, the "discovery rule does not apply"); *Felter v. Norton*, 412 F. Supp. 2d 118, 122 (D.D.C. 2006) (stating that if statute of limitations is jurisdictional, it cannot be overcome by discovery rule), *remanded on other grounds, Felter v. Kempthorne*, 473 F.3d 1255 (D.C. Cir. 2007).

[9]The most history we have found is S. Rep. No. 95-382, at 8 (1997), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1702, which hurts rather than helps Bonneville's position by separating the concept of jurisdiction from that of time in the following language: "Jurisdiction for actions is conferred on U.S. district and state courts; there is a 1 year statute of limitations." There is also a House of Representatives report, but it merely sets out the statutory language and, thus, affords no insights. *See* H.R. Rep. No. 95-131, at 15, 23 (1997).

[10]Fair Debt Collection Practices Act, Pub. L. No. 95-109, § 813, 91 Stat. 874, 881 (1977).

[11]The Office is supervised by the Committee on the Judiciary of the House of Representatives. 1 U.S.C. § 202.

[12]*See Almendarez-Torres v. United States*, 523 U.S. 224, 234, 118 S. Ct. 1219, 1226, 140 L. Ed. 2d 350 (1998).

addition of a title by the Law Revision Counsel cannot change the meaning or intent of a statutory provision.[13] Also, we attach no particular significance to the fact that this statute of limitations appears in the same sentence in which the jurisdiction provision appears. Nothing in the structure of that sentence tells us that the time limitation was also a jurisdictional limitation. In fact, a more natural reading is that parties may bring their action in any "court of competent jurisdiction" and may do so "within one year." 15 U.S.C. § 1692k(d). It is fair to say that parties are faced with a "when" issue and a "what court" issue for every action, but the former does not usually control or affect the latter. In short, we agree with both the fine discussion and the conclusion in *Clark*, 176 F. Supp. 2d at 1068, that is, "the presumption that statutory time limits are not jurisdictional has not been rebutted by anything in the language or legislative history of the FDCPA."[14] That said, we must still consider whether commencement of the one year period was delayed by the discovery rule.[15]

[3] We have made it clear that, in general, the discovery rule applies to statutes of limitations in federal litigation, that is, "[f]ederal law determines when the limitations period begins to run, and the general federal rule is that 'a limitations period begins to run when the plaintiff knows or has reason

---

[13]*See United States v. Welden*, 377 U.S. 95, 98 n.4, 84 S. Ct. 1082, 1085 n.4, 12 L. Ed. 2d 152 (1964); *see also Clark v. Bonded Adjustment Co.*, 176 F.Supp.2d 1062, 1067-68 (E.D.Wash. 2001).

[14]We are aware of the Eighth Circuit Court of Appeals' statement in reviewing this section that it was "not at liberty to disregard the jurisdictional limitations Congress has placed upon the federal courts." *Mattson v. U.S. West Commc'ns, Inc.*, 967 F.2d 259, 262 (8th Cir.1992). But that statement was made without any real analysis, and we are unsure but what "jurisdiction" was used in a somewhat colloquial sense. In any event, we do not agree that the language is jurisdictional.

[15]As we have noted, the discovery rule differs from equitable tolling. *See Garcia*, 526 F.3d at 465. While in most instances the differences may be quite arcane, we need not consider them here because we will hold that the discovery rule does apply. We need go no further.

to know of the injury which is the basis of the action.' " *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1266 (9th Cir. 1998) (quoting *Trotter v. Int'l Longshoremen's & Warehousemen's Union*, 704 F.2d 1141, 1143 (9th Cir. 1983)). Indeed, even when a statute — FCRA — expressly stated that an action must be brought "within two years from the date on which the liability arises"[16] subject to an exception for willful misrepresentation,[17] we held that the discovery rule applied where there was no willful misrepresentation. *See Andrews v. TRW, Inc.*, 225 F.3d 1063, 1066-67 (9th Cir. 2000), *rev'd*, 534 U.S. 19, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001).

The Supreme Court felt that we had gone too far; as it said:

> We doubt that Congress, when it inserted a carefully worded exception to the main rule, intended simultaneously to create a general discovery rule that would render that exception superfluous. In sum, the evidence of the early incarnations of § 1681p, like the "liability arises" language on which Congress ultimately settled, fails to convince us that Congress intended *sub silentio* to adopt a general discovery rule in addition to the limited one it expressly provided.

*TRW Inc. v. Andrews*, 534 U.S. 19, 33, 122 S. Ct. 441, 450, 151 L. Ed. 2d 339 (2001). That, of course, does not speak to the discovery rule, in general, but Bonneville argues that it affects the FDCPA because of a couple of comments by the Court along the way.

**[4]** The Court did say that "[t]he FCRA does not govern an area of the law that cries out for application of a discovery rule." *Id.* at 28, 122 S. Ct. at 447. And, says Bonneville, the

---

[16]15 U.S.C. § 1681p (1994).

[17]*Id.*

FDCPA deals with essentially the same general area of the law. Perhaps so, but nothing in the Court's comment — dicta or not — indicates that crying out was a threshold requirement for a discovery rule, and it certainly made no difference in the case itself, which dealt with the express limitations enacted by Congress for the FCRA.

True it is that, as Bonneville notes, the Supreme Court expressed some skepticism about general application of the discovery rule. It noted that we had presumed that absent express legislation to the contrary "all federal statutes of limitations, regardless of context, incorporate a general discovery rule." *Id.* at 27, 122 S. Ct. at 446. If there were any presumption at all, it said, we had "conspicuously overstated its scope and force." *Id.* The Court then noted that it had previously recognized that federal courts generally apply a discovery rule when a statute does not speak to the issue, but, it continued, "we have not adopted that position as our own." *Id.*, 122 S. Ct. at 447. However, the Court did not say whether it would or would not do so in a proper case because one thing was clear: it had never gone as far as we had gone, and we were wrong to have done so. *Id.*

**[5]** The above is surely food for thought and is worth musing on, but it does not overrule or seriously undermine our general approach to the point that we can now ignore pre-existing Ninth Circuit law. We simply cannot declare that the rule is inapplicable in a case like this one. *Cf. Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) (holding that a panel can reexamine our prior precedent when that has been undermined by later Supreme Court authority.)[18]

**[6]** All of the above being true, we are required to hold that

---

[18]One court of appeals has declined to find that the rule has been undermined at all. *See Skwira v. United States*, 344 F.3d 64, 74-75 (1st Cir. 2003). Another has expressed uncertainty, but has not resolved the issue. *See Johnson v. Riddle*, 305 F.3d 1107, 1114 n.3 (10th Cir. 2002).

Mangum did file in a timely fashion. By any account, the first time she discovered (or could have discovered) that her checks had been disclosed to the City was December 15, 2004, when she spoke with Captain Furu, and she filed her action on December 14, 2005 — close, but good enough.[19] Therefore, the district court erred, and we must reverse the summary judgment as to Bonneville.

### B.   *Section 1983 Claims*

In order to state a 42 U.S.C. § 1983 claim against the City, Mangum was required to show that "(1) the action complained of occurred 'under color of law,' and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right." *Azer v. Connell*, 306 F.3d 930, 935 (9th Cir. 2002). In that regard, it is important to emphasize that § 1983 does not itself create substantive rights; rather, it merely provides a "mechanism for enforcing individual rights" that are conferred or secured by other statutory or constitutional provisions. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S. Ct. 2268, 2276, 153 L. Ed. 2d 309 (2002).

### (1)   *The Statutorily Based Claims*

Mangum asserts a § 1983 claim against the City based upon a claimed violation by the City of the FCRA and the FDCPA. Neither theory is viable.

[7] As the City points out, the FCRA does not even apply to the debt collection agencies, much less to the City. That is to say, it confers no rights against those agencies or the City; its strictures relate only to consumer reporting agencies. But "consumer reporting agency" is an appellation for those that

---

[19]We note that Mangum's long wait after she discovered the disclosure does not affect our decision. *Cf. Socop-Gonzalez v. INS*, 272 F.3d 1176, 1195 (9th Cir. 2001) (en banc) (holding that "the days during a tolled period simply are not counted against the limitations period").

assemble or evaluate consumer credit information, etc., "for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). At most, debt collection agencies (and, sometimes, governmental entities) could be "furnishers" of information to a consumer reporting agency in certain instances,[20] but there is no claim that information was so furnished in this case. In short, this case has nothing whatsoever to do with fair credit reporting,[21] and the FCRA cannot form the basis of Mangum's § 1983 action.

[8] Similarly, while it is conceivable that a debt collector could be held responsible for releasing copies of Mangum's bad checks to the City,[22] a matter on which we express no opinion, nothing in the FDCPA purports to confer a right of action against a third party that received the information. Here, not only was the City not a "debt collector," but also it was not even attempting to collect a debt. Again, there simply is no statutory basis upon which to found a claim against the City based upon the FDCPA.

(2)     *Constitutional Right of Privacy*

Mangum finally argues that she has a viable claim against the City because it violated her constitutional right of privacy when it obtained copies of the insufficient fund checks that she had placed in the stream of commerce. While there is a constitutional right to what is known as informational privacy,[23] which may even encompass confidential financial information,[24] that avails her nothing in this case. What Mangum claims is that once the insufficient-fund check was negotiated

---

[20]*See* 15 U.S.C. § 1681s-2.

[21]*See Gorman v. Wolpoff & Abramson, LLP*, 552 F.3d 1008, 1013-14 (9th Cir. 2009).

[22]*See* 15 U.S.C. § 1692a(6).

[23]*See Nelson v. NASA*, 530 F.3d 865, 877-78 (9th Cir. 2008).

[24]*See Nelson*, 530 F.3d at 877; *Denius v. Dunlap*, 209 F.3d 944, 957-58 (7th Cir. 2000).

by her victim, ultimately rejected by her bank, and then returned to the victim, who put it out for collection but never returned it to her possession, a right of privacy to the information on that instrument somehow sprang into being. That right, she says, would include any insufficient fund information entered upon the check by other parties. We disagree.

**[9]** The Supreme Court put its finger on the core of the problem with Mangum's assertion decades ago, when it was faced with a claim by a defendant that the Fourth Amendment to the United States Constitution precluded the government from subpoenaing checks, deposit slips, and other records, in the hands of the defendant's banks. *United States v. Miller*, 425 U.S. 435, 436-38, 96 S. Ct. 1619, 1621, 48 L. Ed. 2d 71 (1976). The Court stated:

> [W]e perceive no legitimate "expectation of privacy" in their contents. The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business.

*Id.* at 442, 96 S. Ct. at 1624; *see also United States v. Payner*, 447 U.S. 727, 732, 100 S. Ct. 2439, 2444, 65 L. Ed. 2d 468 (1980).

**[10]** Mangum seeks to confine that holding to its narrow facts, that is, checks in the possession of the banks, but points to nothing that would cabin the principle in that way. Why would she acquire more of a privacy right when the bank returned the check to her victim — the person to whom she gave it — or when that victim made further use of that document of false promise? We think there is no viable basis for an assertion that she did. *See, e.g.*, *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743, 104 S. Ct. 2720, 2725-26, 81 L. Ed.

2d 615 (1984) ("It is established that, when a person communicates information to a third party even on the understanding that the communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities."); *United States v. Cormier*, 220 F.3d 1103, 1108 (9th Cir. 2000) (finding no reasonable expectation of privacy in information a person gave a hotel when he registered as a guest); *Wang v. United States*, 947 F.2d 1400, 1403 (9th Cir. 1991) (finding no reasonable expectation of privacy in records a person gave to his financial consultant); *United States v. Choate*, 576 F.2d 165, 175 (9th Cir. 1978) (finding no reasonable expectation of privacy in information on the outside of an envelope deposited in the mail).

**[11]** To the extent Mangum suggests that the very enactment of the FDCPA gave her a right of privacy in the checks and the information thereon as soon as the victims turned them over to collection agencies, we disagree. Congress did indicate that its purpose was to "eliminate abusive debt collection practices,"[25] and noted that those practices can contribute to a number of ills, including "invasions of individual privacy."[26] But that is far from saying that the information on the check itself is private or that once a check is put out for collection, any other person who sees or obtains it, or a copy of it, has violated the bad check writer's right of privacy. In fact, the only remedy for violations of the FDCPA is against the debt collector itself,[27] when that collector wrongfully communicates the information "in connection with the collection" of a debt.[28] That is a relatively narrow prohibition and remedy.[29]

---

[25]15 U.S.C. § 1692(e).

[26]15 U.S.C. § 1692(a).

[27]15 U.S.C. § 1692k.

[28]15 U.S.C. § 1692c.

[29]Here, for example, one might ask whether the disclosure was even in connection with collection of a debt. However, that issue is not before us and we need not decide it at this time.

**[12]** Nor does it avail Mangum to point to the general, and somewhat amorphous, right to informational privacy. No doubt that right exists. *See Nelson*, 530 F.3d at 879-80 & n.5. However, the existence of that right is a far cry from holding that a person who places a negotiable instrument into the stream of commerce, an instrument that could (and indeed would) be seen by numerous individuals, who could, themselves, have shown it to others, including the City, still retained a legitimate expectation that if the check came into the hands of a collection agency, no other individual, including the City, could ask for a copy. The thought that a bad check writer retains some inchoate constitutionally protected right of privacy in what her bad check discloses while and after it moves through the stream of commerce is daedalian, but it will not bear examination. The bad check writer eschews privacy when the check is launched, and surely does not reacquire it along the way. It is one thing to say that a person has a privacy right and can refuse to give out personal information when asked. It is quite another thing to say that having sent a negotiable instrument into the stream of commerce, the person has a privacy right to preclude others from obtaining information that is found upon the instrument itself — here, of course, Mangum's bad check, which she could have reasonably foreseen would wind up in the hands of a collection agency. Simply put, at no point did the information in question become sufficiently personal to merit constitutional protection. *See Ferm v. U.S. Tr. (In re Crawford)*, 194 F.3d 954, 958 (9th Cir. 1999).

It being pellucid that Mangum had no reasonable expectation of privacy in the checks she issued and placed in the stream of commerce, we need not go on to ask whether the City would have an interest in obtaining the information on those checks, which would outweigh some privacy interest of hers. Thus, we will not issue an advisory opinion that purports to balance the City's need for information about a police department employee's improper activities against some

hypothetical interest of Mangum in keeping the information on her bad checks from the City.

## CONCLUSION

Mangum, who issued dozens of bad checks, asserts that her constitutional rights were violated when the city police department, where she worked, obtained copies of the checks from those who were seeking to collect upon them. We hold that no constitutional right of hers was violated. Similarly, the City did not violate any right she had under FCRA or FDCPA. Thus, we affirm the judgment for the City and for Captain Furu, who conducted the City's investigation.

However, the district court erred when it determined that any claim against Bonneville was barred by the FDCPA's one-year statute of limitations, 15 U.S.C. § 1692k(d) on the basis that it was filed more than a year after the alleged "violation" and the discovery rule cannot apply. Because we disagree with the latter proposition, we must reverse.

AFFIRMED in part, REVERSED in part, and REMANDED. The parties shall bear their own costs on appeal.

---

O'SCANNLAIN, Circuit Judge, specially concurring:

I agree with the court that neither Pocatello nor Bonneville is a "consumer reporting agency" within the meaning of the Fair Credit Reporting Act ("FCRA"). Nor do I object to the majority's holding that Pocatello is not a "debt collector" for purposes of the Fair Debt Collection Practices Act ("FDCPA"). I also fully agree that Mangum had no constitutional right to privacy in the bad checks she voluntarily deposited into the stream of commerce. Accordingly, I join Part B of the court's opinion without reservation.

I cannot concur, however, in Part A, which holds that the discovery rule extends the FDCPA's statute of limitations to permit Mangum's otherwise untimely suit. I respectfully suggest that Part A cannot be squared with the plain language of the statute, which starts the clock on the "date on which the *violation* occurs," not the date on which the plaintiff *discovers* the violation. By applying the discovery rule in the face of unequivocal statutory language to the contrary, Part A conflicts with our en banc decision in *Garcia v. Brockway*, 526 F.3d 456 (9th Cir. 2008) (en banc).

Nevertheless, our court's equitable tolling jurisprudence requires me to concur in the result. Although I believe the discovery rule does not apply, equitable tolling permits Mangum's suit under *Socop-Gonzales v. INS*, 272 F.3d 1176 (9th Cir. 2001) (en banc). *Socop-Gonzales*, however, was a significant, unwarranted departure from ancient principles of equity. Because I believe *Socop-Gonzales* was wrongly decided, I concur specially in the court's judgment.

I

Camarie Mangum worked as a dispatcher for the Pocatello Police Department between 1998 and 2005. On December 2, 2004, Police Chief Edward Guthrie went shopping at the local SuperSave store. While there, he discovered that Mangum was listed as a person from whom the store would no longer accept checks. Guthrie ordered an internal investigation to determine whether Mangum's conduct violated department policies relating to moral conduct and professional image.

On December 8, 2004, as part of the investigation, Bonneville provided the department with copies of bad checks written by Mangum. A week later, on December 15, 2004, Mangum met with the investigating officer and became aware for the first time that Bonneville had disclosed the checks. Though she knew within one week that the checks had been disclosed, Mangum waited fifty-one additional weeks—until

December 14, 2005—before she finally sued Bonneville and Pocatello. Thus, Mangum filed suit *more* than one year after the *violation*, but *less* than one year after *discovering* the violation.

## II

The FDCPA's statute of limitations provides: "An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, *within one year from the date on which the violation occurs*." 15 U.S.C. § 1692k (emphasis added).

This language is not ambiguous. A "violation" is "an infringement or transgression"; it is not the discovery of an infringement or a transgression. Webster's Third New Int'l Dictionary 2554; *see also* Black's Law Dictionary 1600-01 (Garner 8th ed.) ("An infraction or breach of the law" or "the contravention of a right or duty."). The "date on which the violation occurs" must refer to the date on which the "infringement" or "transgression" complained of by the plaintiff took place. In this case, Bonneville provided the police department with the checks on December 8, 2004. Mangum's suit was untimely because it was brought more than one year after such disclosures. That should be the end of the matter.

The majority, however, reaches the opposite conclusion. Without discussing the statute's text, the majority applies "the general federal rule . . . that a limitations period begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1266 (9th Cir. 1998). Because Mangum sued less than one year after discovering the disclosures, the majority allows her claim to proceed. The majority appears to be under the impression that our precedent requires us to apply the discovery rule to every non-

jurisdictional statute of limitations, regardless of the plain language of the statute.

That is not our law. Rather, we may apply the discovery rule only when the text of the applicable statute of limitations permits us to do so. In *Garcia*, for example, a tenant asserted that Brockway, the owner of a housing complex, violated the Fair Housing Act by constructing apartments that were not wheelchair compatible. *Garcia*, 526 F.3d at 459. The tenant brought his claim more than two years after the apartments were built, but fewer than two years after he rented an apartment. Under the FHA's statute of limitations, "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the *occurrence or the termination of an alleged discriminatory housing practice*." 42 U.S.C. § 3613(a)(1)(A) (emphasis added). Like the statute at issue here, the FHA's statute of limitations starts the clock on the date the violation occurs, not the date the plaintiff discovers the violation.

Despite the plain text of the statute, the tenant sought to invoke the discovery rule. We rejected his argument, reasoning: "Holding that each individual plaintiff has a claim until two years after he discovers the failure to design and construct would contradict the text of the FHA, as the statute of limitations for private civil actions begins to run when the discriminatory act occurs—not when it's encountered or discovered." *Garcia*, 526 F.3d 465. The "occurrence" of the "discriminatory housing practice," we held, is the "failure to design and construct," not the plaintiff's discovery of the violation. *Id.* at 464.

*Garcia* resolves this case. Just as the tenant's argument conflicted with the plain meaning of the FHA's statute of limitations, Mangum's contention contradicts the plain text of the FDCPA, as the statute of limitations begins to run on the "date on which the violation occurs," not the date on which the violation is discovered. Because the majority's contrary

conclusion creates a stark intracircuit conflict, I cannot join Part A of the court's opinion.

### III

Nevertheless, our court's equitable tolling jurisprudence requires me to concur in the result. Although the discovery rule does not apply, equitable tolling permits Mangum's suit under our decision in *Socop-Gonzales*, a decision, I respectfully suggest, was wrongly decided.

It is an age-old principle that "[e]quity always refuses to interfere where there has been gross laches in the prosecution of rights." *McQuiddy v. Ware*, 20 Wall. 14, 19 (1874); *see also McKnight v. Taylor*, 42 U.S. 161, 168 (1843) ("There must be conscience, good faith, and reasonable diligence, to call into action the powers of the court."); *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 148 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."). Thus, equitable tolling permits an otherwise untimely suit only if the plaintiff shows she acted diligently in pursuing her legal rights.

Here, it is beyond dispute that Mangum grossly neglected her legal rights. Within one week, she discovered that Bonneville had provided the police department with the bad checks. At that point, she still had fifty-one weeks— ninety-eight percent of the original limitations period—in which to file. Yet, inexplicably, Mangum let the limitations period expire, waiting an additional fifty-*two* weeks before filing suit. She offers no explanation for the lengthy delay, and her claim accordingly should be time barred.

Despite Mangum's manifest failure to act diligently, our decision in *Socop-Gonzales* compels me to deem her claim timely. *Socop-Gonzales* invented the rule that "when a statute of limitations is tolled, the days during a tolled period simply are not counted against the limitations period." *Socop-*

*Gonzales*, 272 F.3d at 1195. In other words, the statute does not begin running until the tolled period ends. Applied here, so long as a plaintiff acts diligently before discovering the violation, the limitations period automatically lengthens by a period equal to the time between the violation and the discovery of the violation. Here, Mangum could not reasonably have known of the violation until the police department told her about it. Accordingly, the week between the violation and the discovery mechanically tacks on to the end of the limitations period. Thus, under *Socop-Gonzales*, Mangum timely filed her claim, even though her lengthy fifty-two week delay before filing abundantly demonstrates her lack of diligence.

In another context, the silliness of the *Socop-Gonzales* approach would be obvious. Suppose a college student enrolls in a course with an end of semester paper requirement. She gets sick during the first week of the semester and cannot work on the paper for that week. After she recovers, she spends three and a half months dilly dallying, partying, or otherwise behaving in a non-diligent manner. As December approaches, the paper deadline looms ominously. Seeking an opening, the student reads *Socop-Gonzales* and demands a one week extension based on her illness at the beginning of the semester. Should the professor be obligated to grant the extension?

Unsurprisingly, we are nearly alone in our permissive attitude towards equitable tolling. Before *Socop-Gonzales*, no federal court, in any circuit, had ever concluded that it must turn a blind eye to a litigant's post-discovery lack of diligence. The general rule has always been quite the opposite. *See, e.g., Pace v. DiGuglielmo*, 544 U.S. 408, 419 (2005) ("[N]ot only did petitioner sit on his rights for years *before* he filed his [state post-conviction petition], but he also sat on them for five more months *after* his [state post-conviction] proceedings became final before deciding to seek relief in federal court. Under long-established principles, petitioner's lack of diligence precludes equity's operation.").

Several courts of appeals have also rejected our court's equitable tolling jurisprudence, reasoning persuasively that the plaintiff's post-discovery lack of diligence should matter. *See, e.g.*, *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452 (7th Cir. 1990) ("We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term. It is, after all, an equitable doctrine. It gives the plaintiff extra time if he needs it. If he doesn't need it there is no basis for depriving the defendant of the protection of the statute of limitations."); *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000) ("The claimant had abundant time (74 days) following the EEOC's March 28, 1996 actual release to her of the . . . notice in which to institute her court action prior to the June 10, 1996 expiration of limitations."); *Bhd. of Locomotive Eng'rs v. CSX Transp., Inc.*, 522 F.3d 1190, 1197 (11th Cir. 2008) ("Even when the arbitrator issued an interpretation on April 7, 2006, BLET waited until August 1, 2006, to file its petition for enforcement. These delays show BLET's lack of diligence and such lack of diligence is inimical to a request for tolling."); *Phillips v. Heine*, 984 F.2d 489, 492 (D.C. Cir. 1993) ("[A]lthough courts often speak vaguely of the doctrine's suspending the operation of the statute until the tolling circumstance is corrected, tolling does not bring about an automatic extension of the statute of limitations by the length of the tolling period. It gives the plaintiff extra time *only* if he needs it.").[1]

The traditional rule makes eminent sense. Equitable tolling, as the name indicates, is an *equitable* doctrine; it concerns itself with fairness to litigants. It is not fair to extinguish a plaintiff's claim when she could not have discovered the information necessary to file within the limitations period. On the other hand, there is nothing unfair about preventing a litigant from suing in a situation like the one here, where

---

[1]*But see Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1156 (11th Cir. 2005) (adopting the *Socop-Gonzales* rule).

Mangum had ninety-eight percent of the original limitations period in which to file, and yet inexplicably chose not to do so.

Yet there is certainly unfairness of another kind here. It bears emphasizing that equitable tolling differs from equitable estoppel in that the former applies only when both parties are innocent. *See Cada*, 920 F.2d at 452 (equitable tolling is "a doctrine that adjusts the rights of two innocent parties," whereas equitable estoppel applies when the defendant inequitably prevented the plaintiff from filing). Thus, fairness to the plaintiff is only one side of the equitable tolling coin. The other is avoiding prejudice to a defendant who has done nothing to prevent the plaintiff from filing. When both parties are innocent, I agree with the Seventh Circuit that "the negligence of the party invoking the doctrine" should "tip the balance against its application." *Id.* at 453. In short, applying equitable tolling in this case produces an undeserved windfall to the plaintiff and unwarranted prejudice to the defendant. To return to the parable of the lazy college student, should the college professor grant the extension if doing so would require him to forego a long-planned Christmas vacation with his family?

*Socop-Gonzales*'s justifications for its rule do not withstand scrutiny. Contrary to *Socop-Gonzales*'s view, the automatic extension rule does not promote "certainty and uniformity." *Socop-Gonzales*, 272 F.3d at 1195. Rather, it merely shifts the inquiry from whether the plaintiff had a reasonable amount of time post-discovery to file her claim to whether the plaintiff had actually discovered the violation. As the Seventh Circuit puts it, "[t]he simplicity would be delusive. Inquiry would shift from how much time the plaintiff needed after he discovered the essential information bearing on his claim in order to prepare his complaint to how much information really was essential." *Cada*, 920 F.2d at 453.

Here, for example, suppose Mangum had sued fifty-*three* weeks after discovering the alleged violation. To excuse her

delay, she might have argued that she did not have enough information by December 15, 2004, when she found out that the checks had been disclosed. She might have argued, quite reasonably, that she did not obtain the essential information until she had a few days to read up on the law, or even until she was terminated in August 2006. How much information is enough? This sort of inquiry carries the potential to "extend the statute of limitations in virtually all cases, making the ostensibly fixed deadline illusory." *Id.* "Certainty and uniformity" are victims of the *Socop-Gonzales* rule; they are not beneficiaries.

*Socop-Gonzales* also highlights what it supposes to be Congress' "intended policy objectives": "to permit plaintiffs to take a specified amount of time (even if they don't need it) to further investigate their claim and consider their options before deciding whether to file suit." *Socop-Gonzales*, 272 F.3d at 1196 (internal quotation marks and citation omitted). As the above discussion should make clear, this assertion fundamentally misunderstands the twin purposes of limitations periods. Statutes of limitations balance the interests of *two* parties; they do not exist solely to give plaintiffs a "specified amount of time" to "consider their options." The defendant is interested in repose. The plaintiff is interested in having a reasonable amount of time to file a claim. In contrast to situations in which equitable estoppel is at issue, here the defendant had nothing to do with the delay. If the plaintiff has had enough time to file, the defendant should not be denied repose.

IV

Statutes of limitations "protect important social interests in certainty, accuracy, and repose." *Cada*, 920 F.2d at 452. Congress's adoption of a limitations period reflects a judgment that defendants should not have to worry about stale claims after a certain amount of time has elapsed. Yet our precedent, by turning a blind eye to the defendant's interests, unjustifi-

ably treats statutes of limitations as merely "arbitrary obsta-cles to the vindication of just claims." *Id*. This case is a clear example of how *Socop-Gonzales*'s automatic extension rule, in many circumstances, converts equitable tolling into tolling at will.

Notwithstanding that *Socop-Gonzales* was wrongly decided, I concur specially in the court's judgment.