**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN STAHL,
        *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
        *Defendant-Appellee.*

No. 10-35006

D.C. No.
2:08-CV-00170-FVS

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Fred L. Van Sickle, District Judge, Presiding

Argued and Submitted
November 1, 2010—Seattle, Washington

Filed November 29, 2010

Before: Betty B. Fletcher, Ferdinand F. Fernandez, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Fernandez

## COUNSEL

Gary C. Randall and Eric J. Sachtjen, Workland & Witherspoon, PLLC, Spokane, Washington, for the plaintiff-appellant.

Patrick J. Urda, Department of Justice, Tax Division, Washington, D.C., for the defendant-appellee.

**OPINION**

FERNANDEZ, Circuit Judge:

John Stahl, a member and president of the Stahl Hutterian Brethren ("SHB"), appeals the district court's grant of summary judgment to the United States on his complaint for a refund of personal income taxes. He asserts that because SHB is a 26 U.S.C. § 501(d) corporation and because the medical and meal expenses of its employees are deductible at the corporate level, he has overpaid his personal income taxes. The district court declared that he was not an employee of SHB.[1] We reverse and remand.

**BACKGROUND**

SHB was organized to enable its members to live in accordance with the tenets of the Hutterite tradition. The Hutterite tradition is rooted in sixteenth century Germany. In accordance with their religious beliefs, SHB members live in a colony, and currently the SHB colony includes about 65 members. They are all part of the extended Stahl family, which includes eight brothers, two sisters, their spouses, and their children.

SHB is a 26 U.S.C. § 501(d) nonprofit apostolic corporation. Apostolic corporations maintain a common treasury and do not pay income tax. Instead, the members of a § 501(d) corporation pay personal income tax on their pro rata shares of the corporation's income. As a result, a member's tax liability is reduced when deductions are allowed at the corporate level.

SHB is engaged in the business of farming. It farms 30,000 acres of land and it produces dairy products and a variety of

---

[1]*Stahl v. United States*, 673 F. Supp. 2d 1233 (E.D. Wash. 2009) (*Stahl I*).

crops.[2] SHB earns substantial income selling most of its produce and dairy products to other businesses and at farmers markets. It achieves this with the help of its members and a few part time employees, whom it hires on an as needed basis.

Hutterites disavow individual property ownership, so SHB does not pay a salary to any of its members. Moreover, the members do not contribute to or collect Social Security benefits. All of SHB's property is maintained by it and is used for the benefit of its members. SHB provides for the members' personal needs, such as food, shelter, clothing, and medical care.

According to the bylaws of SHB, any member may be expelled. Expulsion may occur for a variety of reasons, including: the member's refusing to obey SHB's rules; the member's "failing to give and devote all his or her time, labor, services, earnings and energies" to SHB; and the member's "failing to do and perform the work, labor, acts, and things required of him or her." If a member is expelled, he forfeits all interest in SHB's property and leaves with nothing but the clothes on his back.

Stahl brought this action for the purpose of obtaining an income tax refund because, he asserts, corporate level income should have been reduced for tax purposes before it was passed through to him. He insists that the cost of meals and medical expenses of SHB's employees was an ordinary and necessary business expense. The government argued to the district court that none of the Hutterite members, including Stahl, are employees for tax purposes and that should end the inquiry. The district court agreed with the government, and this appeal followed.

---

[2]In addition to potatoes, the farm produces peas, beans, hay, sweet corn, grain corn, and wheat.

## JURISDICTION AND STANDARDS OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1346(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the district court's grant of summary judgment de novo. *See Mangum v. Action Collection Serv., Inc.*, 575 F.3d 935, 938 (9th Cir. 2009). " 'An order granting summary judgment will only be affirmed if the evidence, read in the light most favorable to the non-moving party, demonstrates the absence of a genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.' " *Id.* We also review the district court's denial of a cross-motion for summary judgment de novo. *Avery v. First Resolution Mgmt. Co.*, 568 F.3d 1018, 1021 (9th Cir. 2009).

The taxpayer bears the burden of persuasion in tax refund actions. *Durando v. United States*, 70 F.3d 548, 550 (9th Cir. 1995). In particular, "an income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Interstate Transit Lines v. Comm'r*, 319 U.S. 590, 593, 63 S. Ct. 1279, 1281, 87 L. Ed. 1607 (1943); *see also Meridian Wood Prods. Co., Inc. v. United States*, 725 F.2d 1183, 1189 (9th Cir. 1984).

## DISCUSSION

**[1]** Clearly enough, SHB is not an ordinary commercial enterprise because it is operated, ultimately controlled by, and largely populated by Hutterian brethren. That puts it in a unique category; it is a "religious or apostolic" corporation, which means that its members must "include . . . in their gross income their entire pro rata shares, whether distributed or not, of the taxable income" of the corporation. 26 U.S.C. § 501(d). We have explained the purpose of that provision by quoting the pertinent part of the legislative history as follows:

"It has been brought to the attention of the committee that certain religious and apostolic associations and corporations, such as the House of David and the Shakers, have been taxed as corporations, and that since their rules prevent their members from being holders of property in an individual capacity the corporations would be subject to the undistributed-profits tax. These organizations have a small agricultural or other business. The effect of the proposed amendment is to exempt these corporations from the normal corporation tax and the undistributed-profits tax, if their members take up their shares of the corporations' income on their own individual returns. It is believed that this provision will give them relief, and their members will be subject to a fair tax."

*Kleinsasser v. United States*, 707 F.2d 1024, 1026 n.1 (9th Cir. 1983).

Stahl claims that he was an employee of SHB, and that, therefore, his medical and meal expenses are deductible at the corporate level when SHB's taxable income is determined. The district court decided that he was not an employee. It did not go on to determine whether deductions would be proper if he were one.

**[2]** As we see it, our determination must be driven by the Supreme Court's explication of the meaning of "employee" for federal purposes. Absent some explicit Congressional determination to the contrary, the Court has told us to use the following approach:

"In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this

inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 1348, 117 L. Ed. 2d 581 (1992). While *Darden* was not a tax case, it did rely in part on a revenue ruling, which does, of course, apply in the tax area,[3] and we also have applied the *Darden* factors to a tax case.[4] We see little reason to eschew using that formulation in our consideration of whether Stahl was an employee of the business enterprise SHB operated. As we see it, the fact that the individual Hutterites also play, worship, eat and live together as a matter of their personal beliefs does not detract from the fact that SHB is, among other things, a very successful business.[5]

---

[3]*See* Rev. Rul. 87-41, 1987-1 C.B. 296, 298-99.

[4]*See Prof'l & Exec. Leasing, Inc. v. Comm'r*, 862 F.2d 751, 753-54 (9th Cir. 1988) (deduction for payments to benefit plans for alleged employees).

[5]We recognize that two district courts have suggested the contrary. However, we think that they allowed themselves to be diverted from the employment issue by their focus on the reasons that groups of this kind come together in the first place to perform the main functions of life, including maintaining an employment that enables them to support themselves and their families. *See Wollman v. Poinsett Hutterian Brethren, Inc.*, 844 F. Supp. 539, 542 (D.S.D. 1994); *Israelite House of David v. United States,* 58 F. Supp. 862, 863-64 (W.D. Mich. 1945).

### A.   *Control in General*

**[3]** Although no factor is decisive,[6] the right of SHB to control the day-to-day activities of those who work for it is fundamental.[7] The right to control is, essentially, the right to direct what the alleged employee shall do and the details of how he shall do it;[8] it does not require that the alleged employer actually exercise that right in any particular circumstance.[9] While the government suggests that SHB does not really exercise control over its workforce, on its face that contention is highly unlikely; could it be that an operation which farms 30,000 acres and generates substantial income is run in a manner where workers simply do what they wish and come and go at will? One would intuit not, and the record does not belie the intuition.

SHB has a management hierarchy and benefits from the division of labor at the management level. The SHB members govern themselves by deciding matters by a majority vote of the voting members,[10] and at the head of SHB is the president.[11] The president oversees the finances of the corporation and decides what crops should be planted and where. Below the president are managers, who oversee SHB's farming operations. There are eight managers, three irrigation managers, three mechanics, and two woodworkers. There is also one person in charge of dairy production. The managers are elected based on how they perform, and they may choose to stand down, or if necessary, be replaced by a majority of the voting members. Finally, there is a "head cook" who has two assistants.

---

[6]*Darden*, 503 U.S. at 324, 112 S. Ct. at 1349.

[7]*Professional Leasing*, 862 F.2d at 753.

[8]*Id.*

[9]*Id.*

[10]Not all members are active members, and not all active members are voting members.

[11]The president is elected by the board of directors.

All SHB members have to work in the colony. Each member is assigned a task by a manager, based upon the member's interests, but, while there are no formal rotations, members cannot change their tasks without asking their managers or the president for permission.[12]

Although, technically, the work hours are not fixed, the members do follow a daily work routine. SHB members usually eat breakfast at 6:30 a.m. during the summer and at 7:00 a.m. during the winter. "[R]ight after breakfast, [the members] get moving." Lunch is usually served at 11:30 a.m., although during harvest season it is often taken out to the fields. For most of the tasks, work continues until the sun goes down. Some tasks, such as irrigation, may not end until after sunset. Generally, each member will continue his task until it is finished.

Each member may receive between three weeks to one month of vacation. The president must approve vacation requests, and members do not usually take their vacations during the harvest season.

[4] In short, SHB does exert control over its workers, members or not. They are told what to do, when to work, and whom to ask for "permission" to change tasks or to take vaca-

---

[12]The district court was concerned about the lack of some of the more rigid formalities that exist in other work places. For example, it observed that members are not required to seek permission before taking a sick day unless the assigned task is pressing. *Stahl I*, 673 F. Supp. 2d at 1236. That, however, does not seem overly peculiar to us. The district court also observed that the tasks are assigned based upon the members' interests, and can be reassigned accordingly. Apparently, the court inferred from those observations that SHB does not control its members, but that the members work because they are "self-motivated." However, those observations confuse SHB's business judgment for a lack of control. Moreover, modern management experts are of the opinion that considering a worker's interests is often a good management technique. *See* Peter F. Drucker, The Practice of Management 300 (1954) ("Our experience indicates that what a man is good at is usually the thing he wants to work at . . . .").

tions.[13] In the long run, the amount of control seems very like that which is exerted over employees of a more traditional employer. Perhaps it is exercised with a more gentle and concerned hand, but that is not antithetical to an employment relationship. The control factor favors Stahl.

### B. *Tools and Instrumentalities*

**[5]** SHB furnishes to its workers, including its members, all of the tools and equipment necessary to its business operation. Those include "[t]rucks, tractors, diggers, balers, tillage, . . . [and] [e]very tool a mixed farming operation needs." This factor favors Stahl.

### C. *Location of Work*

**[6]** Virtually all work is performed on SHB's farm. That which is not is performed for the benefit of the farm operation by workers traveling for that purpose. This factor favors Stahl.

### D. *The Right to Discharge*

**[7]** SHB's bylaws make it clear that it has the right to discharge its members for "failing to do and perform the work, labor, act and things requested of him or her." The district court brushed this theory aside, and found that in practice "SHB would not expel a delinquent member from the colony because he performed a job incompetently." *Stahl I*, 673 F. Supp. 2d at 1238. The district court did not cite any authority or fact in support of that finding. Rather, its reasoning apparently flows from the religious aspect of SHB and from the observation that an expelled member would take nothing

---

[13]We note that the record does not specifically state when the workers perform their tasks, but in the dawn to dusk operation of a farm, that appears to be dictated by uncontrollable circumstance — the ineluctable forces of nature.

away from the colony except his clothes. As the district court viewed it, the dismissal mentioned in the bylaws is really a form of religious excommunication, rather than termination from a job. "Only the member who breaks faith with his fellow members will be expelled." *Id.*

There is no evidence to support those district court findings. True enough, no member has ever been "fired" by SHB (according to Stahl, one member of a sister colony has been expelled). That, however, does not mean that no member may be dismissed, even if that is both expulsion and discharge from employment. As the bylaws state, SHB has the right to discharge a member for failing to do his or her job.

We do recognize that the district court could look beyond the bylaws to see whether other facts rule out the theoretical possibility of a discharge. In *Professional Leasing*, 862 F.2d at 752, for example, the taxpayer was in the business of leasing professionals to businesses. At issue was whether the professionals in question were employees of the taxpayer. Regardless of the precise terms of their contracts, we looked to the true substance of the relationship, and determined that they were not employees. *Id.* at 754.

Here, however, we fail to see how SHB's control over those who work for it is illusory. If anything, the relationship between SHB and its members enhances the amount of control SHB may exert over its workers. So does the catastrophic consequence of being terminated for failing to work. In all likelihood, the fact that nobody has ever been expelled from SHB is not because SHB lacks the right to do so, but because every member is dedicated and has thus far given satisfactory attention to the job. The relevant inquiry is not why these individuals are such good workers, but whether SHB may discharge them if they cease to perform. The bylaws say "yes," and the facts do not contradict that. This factor favors Stahl.

### E.   *Permanency of the Relationship*

**[8]** To the extent it is relevant here, it cannot be doubted that the individual members work permanently at SHB. Perhaps that is more true of them than for most workers these days, although extremely long term employment relationships have never been rare. This factor favors Stahl.

### F.   *Regular Business of SHB*

**[9]** SHB is in the business of farming, and it cannot be doubted that the members work on (or at least for) the farming business. While members do engage in other activities, so do typical common law employees. The evidence does not indicate whether separate activities go on during what would be a normal work day, but they do, surely, take place on the farm property. That hardly shows that the members do not work to make the farming enterprise a successful business. Nor is it significant that SHB also hires seasonal employees to assist with the farming operation. What is significant is that the SHB members do work on the farm, and the United States does not dispute that they are the driving force of the farming business. This factor favors Stahl also.

### G.   *Assignment of Additional Projects*

**[10]** As already indicated, the SHB members work permanently at and for SHB's farming enterprise, and the managers assign tasks to the SHB members on an ongoing basis. This factor favors Stahl.

As noted singly, the above seven factors all favor Stahl's contention that he, and the other Hutterites, are employed by the SHB business. Do any factors detract from that? Well, yes.

### H.   *Method of Payment*

**[11]** SHB does not pay wages to its Hutterite workers, and they would not want wages. SHB does provide for all of the

members' personal needs, including food, clothing, housing, medical care, and education, but it does not treat those as wages (it does not pay payroll taxes for them). Moreover, the amount of benefits does not appear to depend on the type of work performed. That the SHB members do not get paid is significant.

But, consider: If the members were paid wages in the usual sense, they would merely donate them back to SHB itself; their religious beliefs demand that. Moreover, because SHB is a § 501(d) organization, the wages would be deducted by SHB, and that would decrease the distributed income accordingly. That is part of the Gordian knot that Congress cut when it adopted the section. It does not demand a conclusion that the members are not employed by SHB at all; it simply underscores the unique nature of their employment.

Still and all, it must be said that this does favor the government's position.

**[12]** Similarly, it cannot be doubted that SHB does not withhold taxes, including Social Security taxes, or withhold workers' compensation or unemployment insurance. As to Social Security taxes, at least, there is no dispute that Hutterians are by their faith forbidden to receive Social Security benefits. That, itself, may explain why SHB does not withhold Social Security and other taxes, although it may not excuse the failure. The government points out that even if that is true, SHB should have followed certain formalities to opt out of participation in the Social Security system. Perhaps the United States is correct. *See, e.g.*, 26 U.S.C. § 1402(g). But even if SHB did violate some law or rule of that nature, the details of that are not before us, and do not directly affect the issue that is before us.[14]

---

[14]The government's argument that SHB might have violated one or more laws of the State of Washington by failing to pay its members minimum wages is also unavailing. SHB's state law violations, if any, are not the subject of this litigation.

On balance, the individual Hutterites, who work for the SHB business, should be seen as common law employees of SHB insofar as they perform the work of that business. They are permanent workers on SHB's grounds and SHB can both insist that they perform their assigned tasks at the proper times and can direct the detail of that performance. Despite the fact that SHB and those members who work for it have a myriad of interconnected relationships, one of those relationships is operation of and working in a business. That connection is most like the relationship between an employer and employee, and should be so treated for tax purposes.

**[13]** That said, just how any particular claimed deduction should be treated at the corporate level remains to be seen. For example, whether, and to what extent, meal expenses can be deducted is a complex issue of its own;**[15]** it is one that the district court should resolve in the first instance. It can do so upon remand.

## CONCLUSION

**[14]** SHB is a Hutterian corporation, which like others of its kind, is treated as a 26 U.S.C. § 501(d) entity. By its very nature, it is not exactly like an ordinary business corporation; nor is it like the more common 26 U.S.C. § 501(c)(3) organizations. Nonetheless, we see no reason to hold that its Hutterite workers are not employed by the SHB business when, as here, they essentially meet the definition of common law employees, even if they have many other relationships among themselves and with SHB. Thus, the district court erred when it held to the contrary and granted summary judgment to the

---

**[15]***See Moss v. Comm'r*, 758 F.2d 211, 213 (7th Cir. 1985) (stating that deducting meal costs "is all a matter of degree and circumstance"); *see also Dobbe v. Comm'r*, 80 T.C.M. (CCH) 577, 583 (2000) (holding that the corporation had the burden of apportioning meals between those that were a legitimate business expense and those that were not), *aff'd on other grounds*, 61 F. App'x 348 (9th Cir. 2003).

government. "Employment" is the sole issue before us, and we will not divagate into others; we leave those to the district court in the first instance.

REVERSED and REMANDED.