DA 11-0572

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 320

BIG SKY COLONY, INC., and DANIEL E. WIPF,

       Petitioners and Appellees,

  v.

MONTANA DEPARTMENT OF LABOR AND
INDUSTRY,

       Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Ninth Judicial District, In and For the County of Glacier, Cause No. DV 10-4 Honorable Laurie McKinnon, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          Steve Bullock, Montana Attorney General; J. Stuart Segrest (argued), Assistant Attorney General, Helena, Montana

      For Appellees:

          Ron A. Nelson (argued); Michael P. Talia; Church, Harris, Johnson & Williams, P.C., Great Falls, Montana

                           Argued: April 25, 2012
                      Submitted: November 28, 2012
                        Decided: December 31, 2012

Filed:

                 _____
                           Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    Appellant Montana Department of Labor and Industry (the Department) appeals from the order of the Ninth Judicial District Court, Glacier County, that granted summary judgment to Appellees Big Sky Colony, Inc., and Daniel E. Wipf (collectively Colony). The District Court determined that the requirement to provide workers' compensation coverage for the Colony's members engaged in certain commercial activities contained in House Bill 119 (2009 Mont. Laws, ch. 112 § 30) (HB 119) violated the Colony's rights under the Free Exercise Clause and the Establishment Clause of the First Amendment to the U.S Constitution, and also violated the Colony's right to equal protection of the laws under the U.S. Constitution and the Montana Constitution.  We reverse.

¶2    We address the following issues on appeal:

¶3    *1. Whether the provisions in HB 119 that incorporate the Colony into the definition of "employer" and the Colony's members into the definition of "employee" under the Workers' Compensation Act violate the Free Exercise Clause.*

¶4    *2. Whether the provisions in HB 119 that incorporate the Colony into the definition of "employer" and the Colony's members into the definition of "employee" under the Workers' Compensation Act violate the Establishment Clause.*

¶5    *3. Whether the provisions in HB 119 that incorporate the Colony into the definition of "employer" and the Colony's members into the definition of "employee" under the Workers' Compensation Act violate the Colony's right to equal protection of the laws.*

FACTUAL AND PROCEDURAL BACKGROUND

¶6     The Hutterite Brethren Church originally formed in the 16th century as part of the Anabaptist movement during the Protestant Reformation in Europe. Anabaptists rejected infant baptism as "unbiblical" and instead renewed the practice of adult baptism. Anabaptists live a life of pacifism. Jacob Hutter and his followers eventually broke away from other Anabaptists over a dispute regarding communal living.

¶7     Jacob Hutter suffered a violent end as he was burned at the stake in a public square in Innsbruck, Austria, in 1536. Austro-Hungarian authorities held Hutter in freezing water and then placed him in a hot room. Authorities further tortured Hutter by pouring brandy on his wounds before burning him to death.

¶8     Hutterite believers moved across Europe for the next several centuries in search of a safe place in which to practice their faith and live their communal life. This wandering eventually brought the Hutterites to North America in the 19th century in search of religious freedom. Hutterites continue to practice their faith and live a communal lifestyle in colonies in Minnesota, North Dakota, South Dakota, Montana, Washington, and parts of Canada.

¶9     The Colony, a signatory to the Hutterian Brethren Church Constitution, organizes itself as a religious corporation under Montana law. The Colony's Articles of Incorporation provide that it was formed for the purpose of operating "a Hutterische Church Brotherhood Community." All members of the Colony must belong to the Hutterische Church Society and all members agree to "live a communal life and follow the teaching and tenets of the Hutterische Church Society." Daniel Wipf serves as the Colony's first minister and corporate president.

¶10     The Department initially determined that the Workers' Compensation Act did not apply to the Colony or its members due to the fact that the Colony did not pay "wages" to its members. The Department based this determination on the fact that the Colony did not fall within the definition of "employer" set forth at § 39-71-117, MCA, and that the Colony's members did not fall within the definition of "employee" set forth at § 39-71-118, MCA. The 2009 Montana legislature enacted HB 119.

¶11     HB 119 worked a laundry list of changes to the Workers' Compensation Act, including revised claims handling practices (§ 39-71-107, MCA), and revised accident reporting requirements for employers (§ 39-71-307, MCA). Pertinent to our analysis, Section 6 amended the definition of "employer" to include:

> a religious corporation, religious organization, or religious trust receiving remuneration from nonmembers for agricultural production, manufacturing, or a construction project conducted by its members on or off the property of the religious corporation, religious organization, or religious trust.

Section 39-71-117(1)(d), MCA. Section 7 of HB 119 amended the definition of "employee" to include:

> a member of a religious corporation, religious organization, or religious trust while performing services for the religious corporation, religious organization, or religious trust, as described in 39-71-117(1)(d).

Section 39-71-118(1)(i), MCA.

¶12     The Colony brought an action against the Department in 2010. The Colony alleged that Sections 6 and 7 of HB 119 impermissibly swept the Colony and its members within the definition of "employer" and "employee" in the Workers' Compensation Act. The Colony and the Department agreed that the inclusion of the Colony within the definition of

4

"employer" and the Colony's members within the definition of "employee" would require the Colony to provide workers' compensation coverage for its members engaged in commercial activities. The Colony alleged that this requirement to provide workers' compensation coverage violated the Free Exercise Clause, the Establishment Clause, and the Colony's right to equal protection of the law.

¶13 The parties filed cross-motions for summary judgment. The District Court first addressed the Colony's Free Exercise claim. The court determined that Sections 6 and 7 were not neutral as the burdens posed "fall only on the Hutterite religion." The court further determined that Sections 6 and 7 were not generally applicable as the bill "unquestionably targets only the Hutterite religious practice of communal living." The two determinations prompted the court to apply strict scrutiny. The court's strict scrutiny analysis led it to reject the Department's claim of any compelling state interest being served by Sections 6 and 7.

¶14 With respect to the Colony's Establishment Clause claim, the court purported to apply the test from *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105 (1971). Sections 6 and 7 foundered on every factor of the *Lemon* Test. The court concluded that Sections 6 and 7 impermissibly "targeted a group defined by their religion." The primary effect of this impermissible targeting, in turn, "would be to inhibit the Colony in the practice of their religion." Finally, the court concluded that excessive entanglement with the State would ensue as it "appears evident that a comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that only particular areas of Hutterite activities are scrutinized."

¶15    The court also determined that Sections 6 and 7 violated the Colony's right to equal protection of the laws. These provisions, according to the court, specifically identify "religious organizations" and target a particular religious organization. The separate classification created by Sections 6 and 7 "treats Hutterites differently from other religious organizations and further targets religious organizations generally." This classification, according to the District Court, failed to satisfy even the rational basis standard that applies to constitutional challenges to workers' compensation laws. The Department appeals.

STANDARD OF REVIEW

¶16    This Court exercises plenary review of constitutional issues. *DeVoe v. City of Missoula*, 2012 MT 72, ¶ 12, 364 Mont. 375, 274 P.2d 752. We review for correctness a district court's decisions on constitutional issues. *DeVoe,* ¶ 12. Statutes enjoy a presumption of constitutionality. The party challenging the constitutionality of a statute bears the burden of proof. *DeVoe,* ¶ 12.

DISCUSSION

¶17    *Issue 1. Whether the provisions in HB 119 that incorporate the Colony into the definition of "employer" and the Colony's members into the definition of "employee" under the Workers' Compensation Act violate the Free Exercise Clause.*

¶18    The District Court determined that the practice of the Hutterite faith demands that its members engage in commercial activities with nonmembers for remuneration. This determination prompted the District Court to analyze the statute based on the strict scrutiny standard applied in the U.S. Supreme Court's decision in *Church of the Lukumi Babalu Aye,*

6

*Inc. v. City of Hialeah*, 508 U.S. 520, 113 S. Ct. 2217 (1993). The Court in *Lukumi Babalu* struck down a group of municipal ordinances that banned animal sacrifice.

¶19     The Santeria church intended to construct a church in the City of Hialeah. Animal sacrifice represents one of the principal forms of devotion of the Santeria church. Church members perform animal sacrifices "at birth, marriage, and death rites, for the cure of the sick, for the initiation of new members and priests, and during annual celebrations." *Lukumi Babalu*, 508 U.S. at 524, 113 S. Ct. at 2222. The City of Hialeah enacted four ordinances immediately after the Santeria church announced its plans to construct a church there.

¶20     The Court recognized that the ordinances, though seemingly neutral on their faces, effectively served to ban animal sacrifices undertaken for religious reasons. The Court likened the religious discrimination effect of the ordinances to an impermissible state law that disqualified members of the clergy from holding certain public offices in *McDaniel v. Paty*, 435 U.S. 618, 98 S. Ct. 1322 (1978). *Lukumi Babalu*, 508 U.S. at 532, 113 S. Ct. at 2226. The Court similarly considered the effect of the ordinances in light of the unconstitutional application of a municipal ordinance in *Fowler v. Rhode Island*, 345 U.S. 67, 73 S. Ct. 526 (1953). *Lukumi Babalu*, 508 U.S. at 532, 113 S. Ct. at 2226. There the city had interpreted a municipal ordinance to prohibit preaching in a public park by a Jehovah's Witness, but to allow preaching during the course of a Catholic Mass or a Protestant church service. *Lukumi Babalu*, 508 U.S. at 532, 113 S. Ct. at 2226, citing *Fowler*, 345 U.S. at 69-70, 73 S. Ct. at 527. The Court in *Lukumi Babalu* concluded that the religious exercise of the Santeria church represented "the only conduct" subject to the prohibition on animal sacrifice. *Lukumi Babalu*, 508 U.S. at 535, 113 S. Ct. at 2228.

7

¶21 The requirement that a religious corporation provide workers' compensation coverage for its members differs markedly from the outright ban of an activity central to the Santeria faith. Unlike the prohibitions in *Lukumi Babalu* and *McDaniel*, the workers' compensation requirement does not prohibit the Colony members from engaging in the commercial activity. HB 119 regulates the Colony's engagement in commercial activities in the same manner that the workers' compensation system regulates the commercial activities of other employers in Montana. The Colony, like all other employers in Montana, simply will make less money on these commercial endeavors once it pays the workers' compensation premiums. And unlike the ordinance in *Fowler*, the workers' compensation requirement does not place the Colony members in a discriminatory position compared to other religious groups who might choose to engage in similar activity. These distinctions lead us to reject the strict scrutiny analysis from *Lukumi Babalu* as the appropriate lens through which to analyze the Colony's claim.

¶22 We instead apply the standard used by the Court in *Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878, 110 S. Ct. 1595, 1599 (1990). The workers' compensation requirement must be facially neutral and serve a secular purpose in order to survive a Free Exercise challenge. *Smith*, 494 U.S. at 878, 110 S. Ct. at 1599. The requirement also must impose only an incidental burden on religious conduct as opposed to a prohibition on religious conduct. *Smith*, 494 U.S. at 878, 110 S. Ct. at 1599.

Facially Neutral and Secular Purpose.

¶23 The District Court concluded that HB 119 "unquestionably targets only the Hutterite religious practice of communal living." This conclusion ignores the fact that the workers'

8

compensation requirement in Montana applies generally to multiple types of entities. *See* § 39-71-117, MCA. The legislature did not conceive of the workers' compensation system as a means to shackle the religious practices of Colony members. HB 119 simply adds to the scope of the workers' compensation system religious corporations that engage in commercial activities with nonmembers for remuneration through its expansion of the definition of "employer" contained in § 39-71-117, MCA.

¶24    No doubt exists that the workers' compensation requirement would apply if the Colony employed its members to work for wages on these commercial activities. Indeed, in *St. John's Lutheran Church v. State Comp. Ins. Fund*, 252 Mont. 516, 524, 830 P.2d 1271, 1277 (1992), this Court rejected a Free Exercise challenge to the requirement that the church provide workers' compensation coverage to its pastor on the basis that the provision of workers' compensation represents "an overriding governmental interest." No doubt exists that the workers' compensation requirement would apply if the Colony opted to establish separate commercial entities to perform the type of work at issue here. *See Ridley Park Methodist Church v. Zoning Hearing Board*, 920 A.2d 953, 960 (Pa. 2007) (denying zoning variance to operate a daycare on church site did not impinge on religious activities of church as operation of the daycare "is not a fundamental religious activity of a church").

¶25    The Dissent suggests that HB 119 would not capture the activities of the other religious employers, in part, because they do not engage in the types of economic activities enumerated by HB 119. Dissent, ¶ 88. HB 119 did not need to capture these other religious employers, however, to incorporate them into the workers' compensation system. Section 39-71-117(1)(a), MCA, already captures other religious employers who engage in

commercial activities. Subsection (a) includes within the definition of "employer" "all public corporations and quasi-public corporations," religious or otherwise. Subsection (a) further includes within the definition of "employer" "each firm, voluntary association, limited liability company, limited liability partnership, and private corporation," religious or otherwise. Finally, subsection (c) defines employer to include "any non-profit association, limited liability company, limited liability partnership, or corporation or other entity," religious or otherwise, that receives federal, state, or local government funds to be used for community service programs.

¶26 The Department of Labor and Industry previously did not consider the Colony subject to the workers' compensation system due to the fact that the Colony did not pay "wages" to its members as part of its communal living system. The Colony nevertheless engaged in commercial activities. The Colony instead provides food, shelter, clothing, and medical care to its members who engage in these commercial activities. *See Stahl v. United States*, 626 F.3d 520, 521 (9th Cir. 2010). HB 119 clarified that religious corporations, organizations, or trusts that engage in specified commercial activities, who do not pay "wages" to their members for labor on these commercial activities, but who receive remuneration from nonmembers, qualify as "employers" for purposes of the workers' compensation system. Section 39-71-117(1)(d), MCA. HB 119 does not lose its facial neutrality or shed its secular purpose due to the fact that it sought to include the colony's commercial activities, as opposed to its religious practices, within the scope of the workers' compensation system.

Incidental Burden or Prohibition on Religious Conduct.

¶27     The District Court pronounced that the communal lifestyle represents the Hutterites' "most distinguishing feature." This communal lifestyle merges religious exercise and labor as a member voluntarily contributes all of his property and labor to the Colony "as an expression of faith and worship." This attribute led the District Court to determine that application of HB 119 to the Colony's commercial activities transformed a potentially valid regulation into an outright prohibition on religious conduct. Courts uniformly have rejected the notion that a party's religious motivation for undertaking an act can transform a generally applicable regulation into a prohibition on religious conduct. *Smith*, 494 U.S. at 878, 110 S. Ct. at 1600. Other courts have recognized that this logic, taken to its extreme, would subsume every facet of a religious organization into a religious activity.

¶28     The Court in *Smith* dismissed the notion that the "religious motivation" for using peyote placed the two employees beyond the reach of a criminal law not directed specifically at their religious practice. *Smith*, 494 U.S. at 878, 110 S. Ct. at 1600. Alfred Smith and Galen Black were fired from their jobs with a private drug rehabilitation organization because they ingested peyote for sacramental purposes at a ceremony of the Native American Church, of which both were members. The employment division denied their claims for unemployment due to the fact that they had been discharged for work-related "misconduct." *Smith*, 494 U.S. at 874, 110 S. Ct. at 1598. The two brought a Free Exercise challenge to the division's denial.

¶29     The Court recognized, similar to the Colony's claim, that the exercise of religion often involves not only belief, "but the performance of (or abstention from) physical acts." *Smith*, 494 U.S. at 877, 110 S. Ct. at 1599. These acts include "assembling with others for a

11

worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation." *Smith*, 494 U.S. at 877, 110 S. Ct. at 1599. The Court noted, in an obvious foreshadowing of its decision in *Lukumi Babalu*, that it likely would be unconstitutional if a state attempted to ban such acts or abstentions only when a person engages in them for religious reasons. *Smith*, 494 U.S. at 877-78, 110 S. Ct. at 1599.

¶30     The Court upheld the denial of benefits based largely upon the fact that peyote use had not been prohibited for religious reasons. The "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the grounds that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith*, 494 U.S. at 879, 110 S. Ct. at 1600, quoting *United States v. Lee*, 455 U.S. 252, 263 n.3, 102 S. Ct. 1051, 1058, n.3 (Stevens, J. concurring). HB 119 does not ban Colony members from engaging in commercial activities with nonmembers for remuneration. It simply regulates this activity by requiring the Colony to provide workers' compensation insurance for its members when they engage in these commercial activities. *See also Mount Elliott Cemetery Assoc. v. City of Troy*, 171 F.3d 398, 403 (6th Cir. 1999) (noting that the Free Exercise Clause does not prevent the government from regulating behavior associated with religious beliefs).

¶31     The U.S. Supreme Court in *Alamo Foundation v. Sec'ty of Labor*, 471 U.S. 290, 105 S. Ct. 1953 (1985), similarly determined that the imposition of generally applicable secular regulations on the volunteer labor of religious members who lived in a communal setting constituted an incidental burden on religion rather than a prohibition on religious conduct.

12

The Alamo Foundation, a non-profit religious organization, challenged the application of the minimum wage, overtime, and recordkeeping requirements of the Fair Labor Standards Act (FLSA). The Foundation argued that it staffed its numerous commercial operations, including service stations, retail clothing and grocery outlets, hog farms, roofing and electrical construction companies, a recordkeeping company, a motel, and companies engaged in the production and distribution of candy, entirely with volunteers, known as "associates." *Alamo Foundation*, 471 U.S. at 292, 105 S. Ct. at 1957.

¶32    These associates typically had been "drug addicts, derelicts, or criminals" before their conversion and rehabilitation by the Foundation. *Alamo Foundation*, 471 U.S. at 292, 105 S. Ct. at 1957. The associates received no cash salaries. The Foundation instead provided them with food, clothing, shelter, and other benefits. The Secretary of Labor initiated an action against the Foundation based upon the notion that the Foundation was "engaged in ordinary commercial activities in competition with other commercial businesses." *Alamo Foundation*, 471 U.S. at 293, 105 S. Ct. at 1957. As a result, the Secretary argued that the "economic reality" test of employment demonstrated that the associates qualified as employees.

¶33    The Court examined the Foundation's claim that the associates functioned as "volunteers" without any expectation of compensation. In fact, one associate testified convincingly that "no one ever expected any kind of compensation, and the thought is totally vexing to my soul." *Alamo Foundation*, 471 U.S. at 301, 105 S. Ct. at 1961. Despite the heart-felt protests of this associate and others, application of the "economic reality" test revealed that the associates expected, indeed relied upon, the benefits conferred by the

13

Foundation in the form of food, clothing, and shelter. *Alamo Foundation*, 471 U.S. at 301, 105 S. Ct. at 1961.

¶34    The Court further rejected the Foundation's claim that application of the generally applicable minimum wage and recordkeeping requirements failed to rise to the level of a prohibition on religious conduct. The Court reasoned that the FLSA does not require the payment of "cash wages." *Alamo Foundation*, 471 U.S. at 303-04, 105 S. Ct. at 1963. The FLSA defines wages to include many of the same benefits that the associates received. With respect to the amount of the benefits, the Court noted that nothing in the FLSA would "prevent the associates from returning the [excess] amounts to the Foundation, provided that they do so voluntarily." *Alamo Foundation*, 471 U.S. at 304, 105 S. Ct. at 1963.

¶35    A church in *South Ridge Baptist Church v. Industrial Comm'n of Ohio*, 911 F.2d 1203 (6th Cir. 1990), filed a declaratory judgment action remarkably similar to the Colony's dispute here, in which it alleged that the compulsory payment of workers' compensation premiums on behalf of its employees was "sinful." The court recognized that the generally applicable requirement of workers' compensation coverage imposed some incidental burden on the church's free exercise of its religious beliefs. The court held, however, that "Ohio's interest in the solvency of the workers' compensation fund" outweighed any incidental burden imposed on the church. The court premised this conclusion on the state's fundamental police power to safeguard the welfare of its citizens. *South Ridge Baptist Church*, 911 F.2d at 1208. *See also United States v. Indianapolis Baptist Temple*, 224 F.3d 627 (7th Cir. 2000) (rejecting church's Free Exercise challenge to a requirement that it pay unemployment tax for its employees).

14

¶36     The Court applied a similar analysis to mandatory payment of a generally applicable sales and use tax in *Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 110 S. Ct. 688 (1990). The constitution and bylaws of Jimmy Swaggart Ministries provide that it "is called for the purpose of establishing and maintaining an evangelistic outreach for the worship of Almighty God." *Jimmy Swaggart Ministries*, 493 U.S. at 381, 110 S. Ct. at 691. Jimmy Swaggart Ministries sold merchandise during 23 crusades in California during the period of 1974 through 1981. This merchandise contained specific religious content – Bibles, Bible study materials, printed sermons and collections of sermons, audiocassette tapes of sermons, religious books and pamphlets, and religious music in the form of song-books, tapes, and records. *Jimmy Swaggart Ministries*, 493 U.S. at 383, 110 S. Ct. at 692.

¶37     The Court analyzed first whether the government "has placed a substantial burden on the *observation of a central religious belief or practice*." *Jimmy Swaggart Ministries*, 493 U.S. at 383, 110 S. Ct. at 693 (emphasis added). The Court rejected the claim that the sales and use tax constituted a tax "on the right to disseminate religious information, ideas, or beliefs." The Court instead characterized the sales and use tax as a tax "on the privilege of making retail sales of tangible personal property" in California. *Jimmy Swaggart Ministries*, 493 U.S. at 389, 110 S. Ct. at 696. California treated the sale of a Bible by a religious organization in the same manner that it treats the sale of a Bible by a bookstore: both would be subject to the tax. *See Knights of Columbus v. Town of Lexington*, 272 F.3d 25, 35 (1st Cir. 2001) (content-neutral ban on unattended structures on historic Battle Green, site of first battle of Revolutionary War, that eliminated Christmas crèche survived Free Exercise challenge).

¶38    The Court further rejected the notion that the collection and payment of the tax would violate the sincere religious beliefs of Jimmy Swaggart Ministries.  The reduction in income to Jimmy Swaggart Ministries represented the only burden imposed by the tax.  The Court deemed "not constitutionally significant" this reduction in the amount of money available to Jimmy Swaggart Ministries to spend on religious activities caused by the imposition of this generally applicable tax. *Jimmy Swaggart Ministries*, 493 U.S. at 391, 110 S. Ct. at 696; *see also Employment Division v. Rogue Valley Youth for Christ*, 770 P.2d 588 (Ore. 1989) (applying unemployment compensation taxation scheme to religious organizations did not offend Free Exercise Clause).

¶39    The Court in *Jimmy Swaggart Ministries* referred repeatedly to a "generally" applicable tax. *E.g., Jimmy Swaggart Ministries*, 493 U.S. at 395, 110 S. Ct. 698.  The Court did not require a tax to apply universally in order for it to be considered neutral toward religious entities.  *See Indianapolis Baptist Temple*, 224 F.2d at 629 (describing federal unemployment tax laws as laws of "general" application).  In the present case, the District Court rejected the notion that Sections 6 and 7 were generally applicable laws based on its determination that the "object of the legislation was remote from the concerns and purpose underlying the Workers' Compensation Act."  The District Court instead viewed HB 119 as "an attempt to 'tax' the Hutterites for a religious practice."

¶40    The Court in *United States v. Lee*, 455 U.S. 252, 102 S. Ct. 1051 (1982), addressed a free exercise challenge to the mandatory participation of an Amish employer in the social security system.  The Court noted that Congress had sought to accommodate, to the extent compatible with a comprehensive national program, the practices of those who believe it a

16

violation of their faith to participate in the social security system. *Lee*, 455 U.S. at 260, 102 S. Ct. at 1057. The Court cited the exemptions on religious grounds for self-employed Amish as an example of the efforts by Congress to accommodate religious beliefs. *Lee*, 455 U.S. at 260, 102 S. Ct. at 1057. The Court further recognized, however, that when "followers of a particular [religious] sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *Lee*, 455 U.S. at 261, 102 S. Ct. at 1057.

¶41 The legislature's regulation of the activities of Colony members would violate the right of members to exercise freely their religion only when the regulation impermissibly singles out "some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi Babalu*, 508 U.S. at 532, 113 S. Ct. at 2226. The workers' compensation system in Montana generally applies to all employers engaged in commercial activities. Section 39-71-401, MCA. The inclusion of religious organizations that engage voluntarily in commercial activities within the workers' compensation system does not single out religious beliefs. *Lee*, 455 U.S. at 261, 102 S. Ct. at 1057. And neither does HB 119's inclusion of religious organizations within the workers' compensation system regulate or prohibit any conduct "because it is undertaken for religious reasons." *Lukumi Babalu*, 508 U.S. at 532, 113 S. Ct. at 2226.

¶42 Courts routinely have rejected Free Exercise challenges to compelled participation by religious organizations in a wide variety of social welfare programs. These programs range from a similar workers' compensation system to the one at issue here, *South Baptist Temple*,

17

to social security, *Lee,* to unemployment tax systems, *Indianapolis Baptist Temple* and *Valley Youth for Christ*, to federal minimum wage and overtime and recordkeeping requirements, *Alamo Foundation*, to state sales and use taxes, *Jimmy Swaggart Ministries*. Each of these religious organizations presented sincere and heartfelt beliefs that its participation in the governmental program violated its religious beliefs. The courts rejected each claim. We, too, reject the Colony's Free Exercise challenge to its participation in Montana's workers' compensation system for Colony members engaged in commercial activities with nonmembers for remuneration. The decision of the legislature to include in the definition of "employer" religious corporations that voluntarily engage in commercial activities with nonmembers for remuneration fails to establish evidence of discrimination against religious organizations. *Cf. Smith*, 494 U.S. at 878, 110 S. Ct. at 1599-1600.

¶43    *Issue 2. Whether the provisions in HB 119 that incorporate the Colony into the definition of "employer" and the Colony's members into the definition of "employee" under the Workers' Compensation Act violate the Establishment Clause.*

¶44    *Lemon* provides the test to analyze government conduct under the Establishment Clause of the First Amendment. The government conduct at issue must (1) have a secular purpose, (2) not have as its principal or primary effect inhibiting religion, and (3) not foster excessive entanglement with religion. *Lemon*, 403 U.S. at 612-13, 91 S. Ct. at 2111. Courts most commonly apply *Lemon* to situations in which the government allegedly has given preference to a religion. *Roemer v. Board of Public Works*, 426 U.S. 736, 96 S. Ct. 2337 (1976). The *Lemon* test likewise accommodates evaluation of a claim brought under the theory of hostility to religion. *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1396 (9th Cir.

18

1994) (applying *Lemon* to a claim that the City of Los Angeles's investigation of a police officer was prompted by hostility to the officer's religious beliefs).

¶45     The purpose prong of *Lemon* asks whether the government's actual purpose "is to endorse or disapprove of religion." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993). As a practical matter, however, a government practice will stumble on the purpose prong "only if it is motivated wholly by an impermissible purpose." *Bowen v. Kendrick*, 487 U.S. 589, 602, 108 S. Ct. 2562, 2570 (1988). We cannot agree with the District Court that an impermissible purpose wholly motivated the legislature's inclusion of Sections 6 and 7 in HB 119.

¶46     The Court in *Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S. Ct. 1526, 1535 (1972), *abrogated in part*, *Smith*, 494 U.S. 872, 110 S. Ct. 1595, recognized "even when religiously based, [one's activities] are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare." The workers' compensation system in Montana undoubtedly promotes the health, safety, and welfare of workers. *Walters v. Flathead Concrete Prods., Inc.*, 2011 MT 45, ¶ 28, 359 Mont. 346, 249 P.3d 913. The decision by the legislature to ensure coverage under the workers' compensation system to members of religious organizations engaged in commercial activities with nonmembers for remuneration furthers this secular purpose.

¶47     The District Court further determined the primary effect of including the Colony's members in the workers' compensation system "would be to inhibit the Colony in the practice of their religion." We evaluate this question from the perspective of a "reasonable observer." *Kreisner*, 1 F.3d at 784. In this regard, we must keep in mind that the

19

Establishment Clause does not demand "that we elevate a group of persons to a privileged status, above all [others], because of their religious beliefs." *Hofer v. DPHHS*, 2005 MT 302, ¶ 42, 329 Mont. 368, 124 P.3d 1098. We must consider instead whether it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion. *County of Allegheny v. ACLU*, 492 U.S. 573, 592-93, 109 S. Ct. 3086, 3100-01 (1989).

¶48 The legislature has chosen to include religious corporations that engage in commercial activities with nonmembers for remuneration in the workers' compensation system. The workers' compensation system applies to many other types of corporations and other entities organized in various fashions that engage in commercial activities. Section 39-71-117(a), (b), and (c), MCA. No reasonable observer would construe the legislature's explicit inclusion in the workers' compensation system of religious corporations that engage in commercial activities with nonmembers for remuneration, along with various other types of corporations and entities, as sending a message of disapproval of religion. *Cf. County of Allegheny*, 492 U.S. at 592-93, 109 S. Ct. at 3100-01.

¶49 The third prong of the *Lemon* test requires the court to examine whether the government action results in "an excessive government entanglement with religion." *Lemon*, 403 U.S. at 613, 91 S. Ct. at 2111. The entanglement prong "seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs." *Cammack v. Waihee*, 932 F.2d 765, 780 (9th Cir. 1991). Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion. *Lemon*, 403 U.S. at 619-22, 91 S. Ct. at 2114-15.

¶50    The Supreme Court usually has found excessive entanglement in situations that involve either state aid to groups affiliated with a religious institution, such as parochial schools, *see, e.g., Aguilar*; *Roemer*; *Levitt v. Committee for Public Educ. & Religious Liberty*, 413 U.S. 472, 93 S. Ct. 2814 (1973); *Lemon*, or where religious employees and public employees must work closely together, *Aguilar*, 473 U.S. at 412-14, 105 S. Ct. at 3237-39 (program required on-site monitoring of sectarian schools by public authorities and coordinated planning by public and sectarian figures).   The Colony's claim presents none of these situations.

¶51    Courts look first to the character and purpose of the religious institution affected by the government action.  *Lemon*, 403 U.S. at 615, 91 S. Ct. at 2112.  Courts next assess the nature of the activity that the government mandates.  *Lemon*, 403 U.S. at 615, 91 S. Ct. at 2112.  And finally, courts evaluate the resulting relationship between the government and the religious institution. *Lemon*, 403 U.S. at 615, 91 S. Ct. at 2112.  *See also Jimmy Swaggart Ministries*, 493 U.S. at 393, 110 S. Ct. at 697.

¶52    The *Alamo Foundation*, 471 U.S. at 303, 105 S. Ct. at 1962, presented a similar excessive entanglement claim.  The Court recognized that the recordkeeping requirement imposed by the FLSA applied only to commercial activities undertaken for a "business purpose."  The recordkeeping requirement would have no impact on the Foundation's "own evangelical activities or on individuals engaged in volunteer work." *Alamo Foundation*, 471 U.S. at 305, 105 S. Ct. at 1963.

¶53    The workers' compensation requirement here applies only to those religious corporations that receive "remuneration" from nonmembers for "agricultural production,

manufacturing, or a construction project." Section 39-71-117(1)(d), MCA. Any extra bookkeeping or recordkeeping would apply only to the Colony's commercial activities undertaken for a "business purpose." *Cf. Alamo Foundation*, 471 U.S. at 305, 105 S. Ct. at 1963. No extra bookkeeping or recordkeeping would be required for labor conducted by Colony members for support of the Colony. The court's decision in *Stahl*, 626 F.3d 520, provides further persuasive reasoning.

¶54    There the president of the Stahl Hutterian Brethren sought a refund of a portion of his personal income taxes. The Stahl Hutterian Brethren is a nonprofit apostolic corporation that maintains a common treasury and pays no income tax. Members instead pay personal income taxes on their pro rata share of the corporation's income. *Stahl*, 626 F.3d at 521. Members live a communal lifestyle similar to the Colony and engage mainly in agriculture. The corporation farms 30,000 acres of land and produces dairy products and a variety of crops that it sells to other businesses and at farmers markets. *Stahl*, 626 F.3d at 521.

¶55    The corporation members disavow individual personal property ownership, and, as a result, members receive no salaries from the corporation. The corporation maintains and uses all of its property for the benefit of its members. The corporation, in turn, provides for the members' personal needs, including food, shelter, clothing, and medical care. *Stahl*, 626 F.3d at 521.

¶56    The president brought an action to obtain an income tax refund on the basis that the corporate income level should have been reduced for tax purposes before his pro-rata share passed through to him. He argued that the costs of meals and medical expenses of the corporation's employees constituted ordinary and necessary business expenses. *Stahl*, 626

22

F.3d at 522. The district court determined that none of the corporation's members, including the president, qualified as employees for tax purposes. *Stahl*, 626 F.3d at 522.

¶57    The Ninth Circuit reversed. The court evaluated whether the corporation's members qualified as employees for tax purposes under federal law. This analysis led the court to determine that "the individual Hutterites" who work for the corporation should be seen "as common law employees" to the extent that these individual members perform the work of the corporation. *Stahl*, 626 F.3d at 527. The court remanded for consideration of the president's claims for deductions.

¶58    On remand, the district court granted the president's claim for deduction. With respect to food, the court reasoned that the corporation's dairy farm operation required round the clock supervision. These employees must be fed. *Stahl v. United States*, 861 F. Supp. 2d 1226, 1231 (E.D. Wa. 2012). Likewise, the court concluded that the corporation had provided food and medical care to the president in return for his labor.

¶59    The court recognized that the corporation and its members had created a community that functions largely without wages. Employee compensation in a wageless community takes the form of housing, food, and medical care. The fact that the corporation and its members had chosen this wageless community for religious reasons proved "irrelevant" as long as the items that the corporation claims as compensation – food and medical care – truly function as compensation in the community. *Stahl*, 861 F. Supp. 2d at 1231. Similar reasoning applied to medical expenses incurred by the corporation to purchase a health plan for the president and the corporation's members and payment for any uninsured charges. *Stahl*, 861 F. Supp. 2d at 1232.

¶60    The Court in *Jimmy Swaggart Ministries* noted that the organization possessed a sophisticated accounting staff and had the ability to segregate retail sales and donations for purposes of obtaining a federal income tax exemption on these donations. Thus, Jimmy Swaggart Ministries easily could track the revenue generated by its retail sales. The Court further recognized that imposition of the tax involved a determination only of whether a sale had taken place and required no determination of whether the materials sold were religious in nature. *Jimmy Swaggart Ministries*, 493 U.S. at 396, 110 S. Ct. at 699. The fact that Jimmy Swaggart Ministries placed a price on its merchandise relieved California of the need to undertake any independent valuation of any religious items. *Jimmy Swaggart Ministries*, 493 U.S. at 396, 110 S. Ct. at 699; *see also Hofer*, ¶ 43 (concluding that an express trust exists between the Hutterite colony and its members and therefore the colony's resources are available to members when considering a member's eligibility for the Family-Related Medicaid Program).

¶61    The court in *South Ridge Baptist* similarly rejected an excessive entanglement claim. The burden imposed by the requirement that the church provide workers' compensation coverage for its employees differed little from the church's other involvements with the state. Ohio law required the church's payroll and wage expenditures to be open for inspection. These payroll reports are sent every six months to employers to be completed and returned. The church would be obligated to report job-related injuries or illnesses and report aggregate wages and the number of employees. None of this information delved into "the religious beliefs of the clergy or the congregation." *South Ridge Baptist*, 911 F.2d at 1210. Moreover, the church undoubtedly remains "subject to a variety of state public welfare regulations,

24

from the zoning, building and fire codes applicable to its place of worship . . . to federal minimum wage and other labor standards governing [its] employment practices." *South Ridge Baptist*, 911 F.2d at 1211.

¶62    The Dissent laments that HB 119 creates a substantial intrusion into the religious practices of the Colony and its members. Dissent, ¶ 99. Neither the Dissent, nor the Colony for that matter, claim that other state regulations of the Colony's commercial activities pose substantial intrusions into the religious practices of the Colony and its members. For example, Title 81 of the Montana Code Annotated regulates commercial agricultural producers of poultry, dairy, and other products. Title 81 further authorizes the Department of Agriculture and county boards of health to promulgate health and safety regulations for commercial agricultural producers. These regulations necessarily require some entanglement between the State and producers of commercial agricultural products, including the Colony.

¶63    The information necessary for the Colony to comply with participation in the workers' compensation system would not delve into the religious beliefs of the Colony or its members. It further appears that the requirement to provide workers' compensation coverage for its members engaged in commercial activities poses no more burdensome recordkeeping requirement than those outlined in *Stahl*. The Colony presently maintains financial records based on its status as a religious corporation so that its members, similar to the religious corporation in *Stahl*, may file tax returns. Finally, as the Department asserts, the Colony retains the option to self-insure as a means to limit excessive entanglement. Section 39-71-2101, MCA. We cannot agree with the District Court's conclusion that "a comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that

only particular areas of Hutterite activity are scrutinized." The recordkeeping required to establish compliance with Montana's workers' compensation system constitutes a valid regulation of the Colony's commercial activities.

¶64 *Issue 3. Whether the provisions in HB 119 that incorporate the Colony into the definition of "employer" and the Colony's members into the definition of "employee" under the Workers' Compensation Act violate the Colony's right to equal protection of the laws.*

¶65 The District Court determined that the separate classification created by Sections 6 and 7 "treats Hutterites differently from other religious organizations and further targets religious organizations generally." A party who asserts an equal protection claim based on a workers' compensation statute must satisfy two separate criteria. *Wilkes v. Mont. State Fund*, 2008 MT 29, ¶ 12, 342 Mont. 292, 177 P.3d 483. The party first must demonstrate that the legislature has created a classification that treats differently two or more similarly situated groups. *Wilkes*, ¶ 12. Once the party has demonstrated a classification that treats groups differently, the party must demonstrate that the discriminatory classification rationally relates to no legitimate governmental purpose. *Wilkes*, ¶ 12.

¶66 The Colony claims that HB 119 singles out the Hutterites and treats them differently than other similarly situated groups. The Colony identifies two separate sets of "similarly situated groups." The Colony first argues that HB 119 treats the Colony differently than any other religious groups. The Colony further argues that HB 119 treats religious groups differently from non-religious groups.

¶67 The Colony argues that its commitment to communal living prevents a member from owning property. As a result, a Colony member who received any compensation for lost

26

wages pursuant to a workers' compensation claim immediately would have to forfeit the money to the Colony or face possible excommunication from the Colony. The Colony claims, however, that HB 119 somehow would prevent the Colony from proceeding to excommunicate a member who received a workers' compensation claim payment. The Colony further claims that no other religion bans ownership of property, and, therefore, HB 119 would affect only the Colony in this manner.

¶68 We first note that nothing prevents an injured Colony member from refraining to file a workers' compensation claim or returning any workers' compensation claim award to the Colony. *Cf. Alamo Foundation*, 471 U.S. at 304, 105 S. Ct. at 1963. More importantly, nothing in HB 119 or any other provision of the Workers' Compensation Act prevents the Colony from proceeding to excommunicate a member who receives compensation for lost wages and refuses to give the money to the Colony. HB 119 treats the Colony no differently than any religious groups that do not prevent ownership of property.

¶69 The Colony next argues that HB 119 creates a group of religious employers and a group of all other employers. HB 119 amended the definition of "employer" explicitly to include religious corporations, organizations, or trusts that engage in commercial activities with nonmembers for remuneration. The Colony claims that the exclusive focus in Section 6 of HB 119 on religious employers results in a system that treats religious employers differently than non-religious employers.

¶70 We look to a statute's plain language to interpret it. *Delaney & Co. v. City of Bozeman*, 2009 MT 441, ¶ 22, 354 Mont. 181, 222 P.3d 618. We must read a whole act together and where possible we must give full effect to all statutes involved. *Delaney & Co.*,

27

¶ 22. Accordingly, we look to the entirety of the Workers' Compensation Act, rather than to a single subsection, to determine whether the Workers' Compensation Act treats religious employers differently than non-religious employers.

¶71 Section 39-71-117, MCA, sets forth in mind-numbing detail the full definition of "employer" for purposes of the workers' compensation system. This extensive definition, including subsections (a), (b), and (c), all of which predated HB 119, applies generally to religious and non-religious entities alike. The definition of "employer" includes the state, counties, cities, public corporations, quasi-public corporations, private corporations, individual people, associations, limited liability companies, and nonprofit associations, as well as numerous other entities. Section 39-71-117(a), (b), and (c), MCA. HB 119 simply adds religious organizations to the types of entities that qualify as an "employer" for purposes of the workers' compensation system. HB 119 treats religious organizations no differently than any other employer under the workers' compensation system. A review of the complete list of entities that qualify as an "employer" for purposes of the workers' compensation system reveals that the Workers' Compensation Act creates no separate classification under HB 119 that singles out religious groups for different treatment.

¶72 The Colony's failure to establish that HB 119 creates "two separate similarly situated groups" that receive unequal treatment under the Workers' Compensation Act ends our inquiry. This failure to establish two separate groups relieves the Court of the need to evaluate whether the alleged disparate treatment rationally relates to any legitimate governmental interest. *Bustell v. AIG Claims Serv.*, 2004 MT 362, ¶ 22, 324 Mont. 478, 105 P.3d 286.

28

CONCLUSION

¶73     We recognize that the issues in dispute present intractable problems that no court ever will resolve to the satisfaction of all parties. Justice O'Connor, in rejecting a challenge brought by Native Americans to enjoin a United States forest service road through sacred areas, summed up our dilemma:

> However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities -- from social welfare programs to foreign aid to conservation projects -- will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions.

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452, 108 S. Ct. 1319, 1327 (1988).

¶74     Reversed and remanded for entry of summary judgment in favor of the Department.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER

Justice James C. Nelson, dissenting.

¶75    I join Justice Rice's well-reasoned and compelling Dissent.

¶76    Although in today's society and politics the principle is honored more in the breach, this Country was founded on the seminal precept that there is a wall of separation between church and state. *See Donaldson v. State*, 2012 MT 288, ¶ 194, ___ Mont. ___, ___ P.3d ___ (Nelson, J., dissenting). To that end, the First Amendment and Article II, Section 5 of Montana's Constitution both contain clear, unambiguous, and unequivocal proscriptions: Congress and the State shall make *no* law respecting an establishment of religion, or prohibiting the free exercise thereof.

¶77    Yet here, as Justice Rice explains, in order to level some theoretical economic playing field and to pacify the complaints of one industry, the Legislature enacted a law targeting Hutterite colonies and preventing them from being able to practice and comport with important doctrines of their religion—a religion that defines and drives every aspect of Colony life.

¶78    Today's decision allows the State to do exactly what the Montana and United States Constitutions expressly prohibit. This Court's decision allows the government to interfere with the doctrinal belief systems of a religious institution and its members. Apparently, henceforth, "no law" prohibiting the free exercise of religion does not actually mean "no law" in Montana. Rather, it means no law, except to the extent that the law greases the squeaky wheel of a powerful industry.

30

¶79 I dissent.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶80 To reach its decision, the Court uses waves of generic statements that fail to account for the facts of this case, the arguments of the Colony, and the applicable legal tests. The Court makes no effort to determine whether the challenged legislation constitutes a religious gerrymander, even though courts "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Lukumi Babalu*, 508 U.S. at 534, 113 S. Ct. at 2227. The Court minimizes the Colony's claim to merely "sincere and heartfelt beliefs that its participation in the governmental program violated its religious beliefs," and cites to numerous cases that reject claims of that nature, while failing to acknowledge that this case is factually, and fundamentally, different. Opinion, ¶ 42. I believe the facts and law, when properly considered, demonstrate that the Legislature created a clear religious gerrymander applicable only to the Hutterites and that such action was not justified by a compelling state interest. I would affirm the District Court's holding that their right to free exercise of religion was violated.

¶81 A law affecting the constitutional guarantee of free exercise of religion is to be both facially neutral and generally applicable. *Lukumi Babalu*, 508 U.S. at 531-32, 113 S. Ct. at 2226 (citing *Smith*, 494 U.S. at 879-81, 110 S. Ct. at 1600-01). A law failing to satisfy the requirements of neutrality and general applicability "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*

31

*Babalu*, 508 U.S. at 531-32, 113 S. Ct. at 2226. A law is not neutral if the text of the law has a targeting effect or a discriminatory object as discerned from direct and circumstantial evidence. *Lukumi Babalu*, 508 U.S. at 533-34, 113 S. Ct. at 2227. The Court in *Lukumi Babalu* stated:

> Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt. 'The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.'

*Lukumi Babalu*, 508 U.S. at 534, 113 S. Ct. at 2227 (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 696, 90 S. Ct. 1409, 1425 (1970) (Harlan, J., concurring)). In determining that the contested ordinances in *Lukumi Babalu* were not neutral, the Court reviewed the legislative record and history surrounding the enactment of the ordinances, stating, "the effect of a law in its real operation is strong evidence of its object." *Lukumi Babalu*, 508 U.S. at 535, 113 S. Ct. at 2228. The Court found that the four contested ordinances created an impermissible religious gerrymander because they "were drafted in tandem" to "target petitioners and their religious practices." *Lukumi Babalu*, 508 U.S. at 535, 113 S. Ct. at 2228.

¶82 To appreciate the Hutterites' arguments, it is first necessary to understand their unique religious principles. The Court offers generally that the Hutterite faith is one in which "all members agree to live a communal life and follow the teaching and tenets of the Hutterische Church Society," Opinion, ¶ 9, but fails to discuss the manner in which the Hutterites were targeted or articulate the critical tenets which the legislation would require the Hutterites to violate in order to participate in the workers' compensation system.

32

¶83 To begin, the record establishes that a hallmark of the Hutterite religion is the communal lifestyle where religious exercise and labor are not divisible because "[a]ll labor and support provided by members to the Colony is done for their own personal religious purpose without promise or expectation of compensation. The performance of labor and support for the Colony is an act of religious exercise." Hutterites eat meals, worship, work, and are educated entirely communally and they do not associate with "non-members." The Membership Declaration, to which every member of the Colony must subscribe, affirms each member's responsibility to relinquish current and future property rights to the Colony, and members are not permitted a wage or salary. In fact, the Hutterite faith prohibits the payment of wages for labor performed by its members. At oral argument, the State conceded that the wage replacement component of workers' compensation coverage would not be applicable to Colony members because, pursuant to their tenets of faith, they cannot receive wages.[1] Farming and agricultural production has been a part of the Hutterite lifestyle for hundreds of years and is specifically named in the Colony's Articles of Incorporation and the Hutterian Brethren Church Constitution as a central component of the Colony's livelihood. The Colony also participates in manufacturing and construction projects.

¶84 In *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972), parents of Amish children challenged Wisconsin's law requiring all children to attend school until age 16, claiming that their beliefs required children to be educated within the Amish community

---

[1] The State also argued that Colony members could nonetheless receive medical benefits from the mandated coverage, but this would require the forbidden act of filing a legal claim, discussed further herein. As to medical care, the record reflects that "the colonies fund the medical care that their

33

after completion of eighth grade in order to limit exposure to worldly influences inconsistent with their religious beliefs. *Yoder*, 406 U.S. at 210-13, 92 S. Ct. at 1530-32. The Supreme Court held that Wisconsin's compulsory school attendance law unduly burdened the Free Exercise Clause by forcing Amish parents to send their children to public school after the eighth grade in violation of one of the core Amish religious beliefs. *Yoder*, 406 U.S. at 234-35, 92 S. Ct. at 1542. In its analysis, the Supreme Court stated that "we must be careful to determine whether the Amish religious faith and their mode of life, are . . . inseparable and interdependent." *Yoder*, 406 U.S. at 215, 92 S. Ct. at 1533. As in *Yoder,* the record here supports the determination that the communal way of life of the Colony is "one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Yoder,* 406 U.S. at 216, 92 S. Ct. at 1533. The command to live communally and without property or legal claims is fundamental to the Hutterite faith.

¶85     In addition to the communal lifestyle that requires renouncement of wages and the ownership of property, and critical to an understanding of the conflict presented by their inclusion into the Workers' Compensation Act, is the tenet that making a legal claim is a violation of fundamental Hutterian doctrine. Daniel Wipf's affidavit states that "Christians shall not sue one another at law nor sit in judgment of one another. Hutterites cannot make claims against others for wrongs done to them." The Membership Declaration, which every member of the Colony must sign, states:

> I declare that my acceptance of membership and the terms and conditions of membership is a matter of my religious beliefs . . . Among those

members need. Each individual Colony still provides full no-fault medical care for its members" and "[r]egardless of the reason for any member's illness or injury, the member is cared for."

34

beliefs is the commandment to live at peace with fellow believers, to resolve disputes within the Church, and *not to seek redress before secular authorities whether related to secular or sectarian issues.*

(Emphasis added.) Wipf's affidavit explains that a member who does not convey his or her "ownership" of a legal claim to the Colony, like other property, would be subject to excommunication, or essentially termination from membership in the Colony. He states, "I do not know of any Hutterite member who has made any workers' compensation claim against a Hutterite colony in Montana or against the Uninsured Employers['] Fund."

¶86    HB 119's legislative history must be considered in order to understand the impact of the bill. The United States Supreme Court has looked both to the text and to the legislative history of a law to determine whether legislators intended to target religious practices, *Lukumi Babalu*, 508 U.S. at 533-34, 113 S. Ct. at 2227, although the Court fails to do so here. The Department proposed HB 119 to address complaints received "about Hutterite colonies competing with other Montana businesses, such as contractors, without having to provide workers' compensation insurance." The only religious group named in the legislative debates surrounding HB 119 was the Hutterites, and both the House and the Senate specifically discussed the impact HB 119 would have on Hutterite colonies. Representative Hunter said, "[i]n particular, we are speaking of, in [Sections 6 and 7], about Hutterite colonies" when he introduced HB 119 in the House Committee and reiterated this concept to the Senate Committee. Mont. H. Comm. on Bus. & Labor, *Hearing on H. Bill 119*, 61st Legis., Reg. Sess. (Jan. 8, 2009); Mont. Sen. Comm. on Bus., Labor, & Econ. Affairs, *Hearing on H. Bill 119*, 61st Legis., Reg. Sess. (Mar. 5, 2009). Senator Stewart-Peregoy characterized HB 119 and the corresponding Legislative debate as "targeting" the

35

Hutterites, stating, "if we're going to target a group, we should have just put Hutterite religious organizations and let's be done with it. . . . [W]e are targeting a group and I just wanted that for the record." Mont. Sen. Comm. on Bus., Labor, & Econ. Affairs, *Hearing on H. Bill 119*, 61st Legis., Reg. Sess. (Mar. 11, 2009). Additionally, Senator Balyeat acknowledged HB 119 was really "aimed" at the Hutterite religious colonies near Great Falls. Mont. Sen., *Floor Session on H. Bill 119*, 61st Legis., Reg. Sess. (Mar. 16, 2009). The legislative record clearly shows that the objective intent of the legislators was none other than to target the Hutterites.

¶87    In response to this expressed legislative intention, the text of HB 119 was amended throughout the legislative process to focus more and more narrowly on the Hutterites. Language was inserted within Section 6's definition of employer to read "a religious corporation, religious organization, or religious trust receiving remuneration *from nonmembers for agricultural production, manufacturing, or a construction project* conducted by its members on or off the property of the religious corporation, religious organization, or religious trust." Section 39-71-117(1)(d), MCA (emphasis added). The language "agricultural production, manufacturing, or a construction project"—instead of *all* commercial activities—was inserted into HB 119 to incorporate only those specific business enterprises in which the Hutterites engaged. Here, the Court's tactic of ignoring the facts and over-generalizing HB 119 and the Act as a whole in order to give the appearance that the Act applies equally to all employers is well illustrated. *See* Opinion, ¶ 21 ("HB 119 regulates the Colony's engagement in commercial activities in the same manner that the workers' compensation system regulates the commercial activities of other employers in

36

Montana."). The Court repeatedly states that HB 119 applies to all "commercial activities" and bases its analysis thereon. *See* Opinion ¶¶ 18, 21, 23, 24, 25, 26, 27, 30, 41, and 42. However, the text of HB 119 does not apply to "commercial activities" generally, nor does HB 119 use the term "commercial activities" at all. Rather, it employs the phrase "agricultural production, manufacturing, or a construction project"—only those economic activities that the Legislature knew the Hutterites to be engaged in.

¶88 Similarly, the Court makes repeated statements to the effect that all religious employers are treated the same as other employers. *See* Opinion, ¶ 71 ("HB 119 treats religious organizations no differently than any other employer under the workers' compensation system"; "the Workers' Compensation Act creates no separate classification under HB 119 that singles out religious groups for different treatment."). However, these statements are not supported by the text of HB 119. Religious employers such as a Presbyterian Day Care, a Mormon Cleaning Service, or a Catholic Social Agency would not satisfy HB 119's definition of religious "employer" for multiple reasons, the first being that they are not engaged in the economic activities targeted by the bill—"agricultural production, manufacturing, or a construction project."[2, 3]

---

[2] These are examples of religious employers who would be exempt from participation under § 39-71-117(1)(d), MCA. However, it is possible that a social agency could come within the definition of employer under § 39-71-117(c), MCA, if it was "funded in whole or in part by federal, state, or local government funds."

[3] The Court responds that HB 119 did not need to capture these other religious employers because they and the Hutterites were already included under other statutory provisions. Opinion, ¶ 25. The Court then reasons that the revision to the statutory definition of "wages" to include the concept of "remuneration" was all that was necessary to bring the Hutterites into the workers' compensation system. Opinion, ¶ 26. The State has not made these assertions, and the Court cites neither to authority nor to the record to support them. They are not supported by the plain language of the other provisions, which makes no reference to religious employers. If religious employers were

37

¶89    The Court distinguishes cases that have struck down legislation for violating the free exercise right by reasoning that HB 119 "does not place the Colony members in a discriminatory position compared to other religious groups who might choose to engage in similar activity. These distinctions lead us to reject the strict scrutiny analysis . . . ." Opinion, ¶ 21. Again, this distinction—and the conclusion based thereon to reject strict scrutiny review—is likewise belied by the text of HB 119. The Legislature cleverly drafted Sections 6 and 7 to include only the Hutterites engaged in these economic activities and to exclude other religious groups. Under these provisions, an "employee" must be "a member" of the "religious corporation, religious organization, or religious trust while performing services" for the organization. Correspondingly, an "employer" is defined as a religious organization engaged in the targeted economic activities *only when* such activities are "conducted by its members." *See* Section 39-71-117(1)(d), MCA. As mentioned, all Hutterite labor is provided by members of their communal organization. The "performance of labor" is a religious exercise required of every member "to the extent of his or her ability" and is provided for the "personal religious purpose" of the members. Hutterites do not associate for these purposes with nonmembers, who provide no labor for the organization. By merely hiring employees who are not "members" of their organization, other religious

already completely encompassed by other provisions, it would have been unnecessary to create the new category of "religious organization" within the statutory definition of "employer," as HB 119 did. *See* § 39-71-117(1)(d), MCA. Likewise, it would have been unnecessary to create, within the statutory definition of "employee," the new category of a "member" of a religious organization "while performing services" for the religious organization. *See* § 39-71-118(1)(i), MCA. I note that the former statutory provision under which the religious employer in *St. John's Lutheran Church* was required to participate in workers' compensation was subsequently repealed. *See* Sec. 13, Ch. 448, L. 2005. Context matters, and I believe that consideration of context should include all of the

organizations choosing to participate in the named economic activities could be exempted from the provisions of HB 119. The tenets of the Hutterite religion, however, do not permit this evasion, as their labor is provided by members only. HB 119 incorporates religious organizations within workers' compensation only when "members" (§ 39-71-118(1)(i), MCA) of a religious organization provide labor and services to "nonmembers" (§ 39-71-117(1)(d), MCA)—a scheme which only applies to the religious structure of the Hutterites. There is no evidence in the record that any other religious organization would be incorporated into the workers' compensation system under these provisions.

¶90     The text reveals further targeting of the Hutterites. HB 119 created the new financial category of "remuneration," § 39-71-117(1)(d), MCA, and in other provisions drafted in tandem, revised § 39-71-123(5), MCA, to incorporate a method for calculating remuneration so that the Act would apply to the Hutterites, who receive no wages. No other religious organization is identified in the record as using a non-wage system. HB 119's application to the specified economic activities when "conducted by its members on or off the property" of the religious organization, § 39-71-117(1)(d), MCA, is a reference to the practice of the Hutterites living communally on their own property and providing services off their property.

¶91     Some of these provisions could be potentially innocuous methods of defining a religious entity for incorporation within the workers' compensation system as part of a broad inclusion of all religious organizations within the system. However, the Legislature did not

text of HB 119, the Act as a whole, and the legislative history, which reveal an effort of laser-like precision to capture only the Hutterites.

broadly incorporate all religions. Rather, it enacted these provisions to define and target only the Hutterite religion for inclusion within the system. While the text of HB 119 is not facially discriminatory, its history and text reveal that it nonetheless fails to be neutral and generally applicable. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Lukumi Babalu*, 508 U.S. at 534, 113 S. Ct. at 2227. The effect of HB 119 is to create a religious gerrymander that improperly singles out one religion. *Lukumi Babalu*, 508 U.S. at 535, 113 S. Ct. at 2228 ("Apart from the text, the effect of a law in its real operation is strong evidence of its object."). The significance of a religious gerrymander under the proper legal analysis is that it must sustain strict scrutiny review. *Lukumi Babalu*, 508 U.S. at 531-32, 113 S. Ct. at 2226.

¶92 The Court relies on cases that rejected Free Exercise challenges to truly generally applicable statutes. Generally applicable laws are not subject to strict scrutiny review and thus are more easily defended against challenges. In *Alamo Foundation* and *Jimmy Swaggart Ministries*, religious organizations challenged labor and tax laws that were generally applicable to the commercial activities of all organizations, including religious organizations. Similarly, *South Ridge Baptist Church*, *Lee*, and *Rogue Valley Youth for Christ* challenged generally applicable tax and wage requirements. In these cases, the religious organizations merely argued that compliance with such neutral and generally applicable requirements violated the tenets of their faith. Unlike HB 119, there was no effort in those cases to draft the challenged laws with the purpose to gerrymander and include a

40

particular religious organization within the system. The failure to draft HB 119 in a generally applicable manner necessarily requires strict scrutiny review.

¶93    That being so, the State argues that a compelling state interest can be demonstrated. It offers that HB 119 was enacted for two legitimate government interests, including protection of the Uninsured Employers' Fund (UEF) from potential liability for a catastrophic injury claim filed by a Hutterite member and ensuring fair competition among businesses by eliminating the Hutterites' perceived advantage. Regarding the first, the UEF only applies to uninsured "employers" who are subject to the Act but have not provided coverage for their employees. *See Zempel v. Uninsured Employers' Fund*, 282 Mont. 424, 431, 938 P.2d 658, 663 (1997) (citations omitted) ("[O]nly injured employees of employers meeting the definition of uninsured employer . . . are entitled to the 'substitute' workers' compensation benefits the UEF was created to provide to injured employees of employers who have failed to 'properly comply' with the Act. . . . As a result, the UEF has no funding mechanism to provide 'substitute' workers' compensation benefits to injured employees of employers not subject to the Act."). Consequently, prior to HB 119, a claim could not have been filed by a Hutterite member against the UEF because the Colony was not an "employer" subject to the Act—and none have been filed. The State is attempting to legitimize HB 119 by arguing that the bill provides a solution to a problem that did not exist prior to the bill's enactment. Additionally, even if the UEF was a legitimate government concern, HB 119 does not further that concern. As noted by the District Court, a fundamental tenet of the Hutterites' faith is that they cannot make legal claims against others. The Hutterite faith includes "the commandment to . . . not to seek redress before secular authorities whether related to secular

41

or sectarian issues." A governmental interest in protecting the UEF from claims that are prohibited as a matter of law, made by people whose faith forbids them to make such claims, can hardly be considered "legitimate."

¶94 The State's second argument that HB 119 was enacted for a legitimate government purpose pertained to complaints from businesses about unequal competition with the colonies. We recognize that the State has legitimate interests in the financial viability of the workers' compensation system, in controlling costs, and in providing benefits. *See Stratemeyer v. Lincoln Co.*, 259 Mont. 147, 155, 855 P.2d 506, 511 (1993); *Eastman v. Atlantic Richfield Co.*, 237 Mont. 332, 339, 777 P.2d 862, 866 (1989). However, the State has provided no authority for the proposition that ensuring "competitive fairness" among the state's businesses is an objective of the workers' compensation system. Rather, the workers' compensation system is directed to providing care and rehabilitation to injured workers and returning them to work as soon as possible. *Caldwell v. MACo Workers' Comp. Trust*, 2011 MT 162, ¶ 31, 361 Mont. 140, 256 P.3d 923. Further, the State has not made an effort to demonstrate that requiring the Colony to pay for workers' compensation coverage would actually address the concern over unfair competition, where any competitive advantage of the Colony would appear to be primarily because of its nonpayment of the more substantial expenses of wages and benefits, unique to the Colony's religious beliefs. The State argues that fairness "is a viable legislative goal, and the Legislature is entitled to take steps to ensure that the workers' compensation system is fair to all participants, whether religious or secular." However, whether or not "fairness" among competing businesses is a viable goal of the workers' compensation system, it pales in comparison to "one of the most cherished

42

and protected liberties in our society," *St. John's Lutheran Church*, 252 Mont. at 523, 830 P.2d at 1276, and cannot be accomplished by legislation that targets a particular religious group and intrudes upon their internal religious practices. The State's interest in insuring a viable workers' compensation system or creating a "level playing field" is not legitimized by HB 119 in a way that satisfies the rigorous standards protecting the free exercise of religion.

¶95 The State argues there is a compelling state interest because workers' compensation, like social security, "serves the public interest by providing a comprehensive insurance system with a variety of benefits available to all participants . . ." (quoting *Lee*, 455 U.S. at 258, 102 S. Ct. at 1055), and this interest is advanced by HB 119's intention to correct the purported unfair competitive advantage the Colony has over other businesses. However, HB 119 fails to prohibit nonreligious conduct that endangers the State's purported government interests of preventing a catastrophic claim against the UEF and address the perceived business advantage enjoyed by the Hutterites by not participating in the workers' compensation system. The Workers' Compensation Act currently exempts other areas of employment in agriculture, manufacturing, and construction that could affect the UEF or the viability of the workers' compensation system. For example, § 39-71-401(2), MCA, exempts certain employments from the Act, unless the employer elects coverage and the insurer allows coverage, including: household or domestic employment (§ 39-71-401(2)(a)), casual employment (§ 39-71-401(2)(b)), employment of a person performing services in return for aid or sustenance only (§ 39-71-401(2)(h)), a person who is employed by an enrolled tribal member or an association, business, corporation, or other entity that is at least 51% owned by an enrolled tribal member or members, whose business is conducted solely

43

within the exterior boundaries of an Indian reservation (§ 39-71-401(2)(m)), and a person who is an officer or manager of a ditch company (§ 39-71-401(2)(s)).[4]  Similarly, independent contractors may waive rights and benefits of the Act if they obtain an independent contractor exemption (§ 39-71-401(3)).  These exemptions are contrary to the governmental interests asserted by the State, and lend further credence that the Legislature's intent, as demonstrated above, was to pursue "governmental interests only against conduct motivated by religious belief." *Lukumi Babalu*, 508 U.S. at 545, 113 S. Ct. at 2233.

¶96   HB 119 is likewise not narrowly tailored and it places an impermissible burden on the Hutterite religion.  A law is narrowly tailored when the law achieves its stated ends without unduly burdening religion.  *See Lukumi Babalu,* 508 U.S. at 546, 113 S. Ct. at 2234; *Yoder,* 406 U.S. at 220-21, 92 S. Ct. at 1536.  Following the United States Supreme Court, this Court has previously applied the *Thomas* test to determine whether there is a burden on the free exercise of religion:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.

*Griffith v. Butte Sch. Dist. No. 1*, 2010 MT 246, ¶ 62, 358 Mont. 193, 244 P.3d 321 (quoting *Valley Christian Sch. v. Mont. High Sch. Ass'n*, 2004 MT 41, ¶ 7, 320 Mont. 81, 86 P.3d 554; *Thomas v. Review Bd. of Ind. Empl. Sec. Div.*, 450 U.S. 707, 717-18, 101 S. Ct. 1425, 1432 (1981)).  There is a burden on the free exercise of religion when the state causes an

---

[4] This Court has periodically discussed these exemptions to the Act, *see i.e., Weidow v. Uninsured Employers' Fund*, 2010 MT 292, 359 Mont. 77, 246 P.3d 704; *Cottrill v. Cottrill Sodding Serv.*, 229

"internal impact or infringement" on the relationship between a religious entity and its members or "on their sincerely held religious beliefs." *St. John's Lutheran Church*, 252 Mont. at 526, 830 P.2d at 1278. The United States Supreme Court's 2012 *Hosanna-Tabor* decision further supports the premise that there is an impermissible burden on the free exercise of religion when a government action causes an "internal impact" on religious beliefs. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Empl. Opportunity Comm'n*, ___ U.S. ___, 132 S. Ct. 694 (2012).

¶97    The State argues that the burden imposed by the workers' compensation system on the Hutterites is incidental. However, it fails to recognize that the operation of HB 119 and the Act interferes with the internal relationship between the Colony and its members under the central tenets of the Hutterite faith. The Hutterite faith prohibits all property ownership, but the Act requires injured employees to initiate and thus "own" a claim against the employer or its insurer to receive benefits under the Act. *See* § 39-71-603, MCA. The State argues, and the Court accepts, that self-insurance is a viable option for the Colony, under which a claim would be made to the Colony itself without any determination of whether a member is possessing property. *See* Opinion, ¶ 63. However, the statute cited for this premise, § 39-71-2103, MCA, actually provides that after an employer is approved to be self-insured, the employer may "make payments directly to the employees as they may become entitled to receive the payments." Such payments to Colony members are exactly the problem because the Colony's beliefs require members to relinquish property and live communally.

Mont. 40, 744 P.2d 895 (1987); *Bennett v. Bennett*, 196 Mont. 22, 637 P.2d 512 (1981).

¶98    Further, in the event a member would file a workers' compensation claim against the Colony, an act directly contrary to Hutterite religious principles, the member faces excommunication from the Colony. The Court's solution for this religious burden is that "nothing prevents an injured Colony member from refraining to file a workers' compensation claim or returning any workers' compensation claim award" or, alternatively, the Colony could proceed "to excommunicate a member who receives compensation for lost wages and refuses to give the money to the Colony." Opinion, ¶ 68. The Court thus reasons that the Hutterites could simply forego participation in the system to comply with its religious beliefs. Yet, the financial burden would remain, for which no benefit would be paid. This is the very definition of illusory coverage that "defies logic" and violates public policy. *See Hardy v. Progressive Specialty Ins. Co*., 2003 MT 85, ¶ 37, 315 Mont. 107, 67 P.3d 892. The Court also reasons that the burden placed upon the Colony could be addressed by a member violating his religious tenets and having the Colony excommunicate the member. Opinion, ¶ 68. I would suggest that this is not a permissible rationale for justifying the State's internal impact upon a religion's practices.

¶99    I would thus reject the State's argument that the burden imposed here is incidental. HB 119 creates a substantial burden on the Colony's religious practice because, in order for the Colony and its members to actually participate under the Act, they must violate their sincerely held religious beliefs.[5] HB 119 creates substantial internal intrusion into the religious practices of the Colony and its members, burdening the Hutterites' religious

---

[5] No question has been raised about the sincerity of the Colony's religious beliefs. *See i.e., Sherbert v. Verner*, 374 U.S. 398, 399 n. 1, 83 S. Ct. 1790, 1791 n. 1 (1963).

46

practices. Strict scrutiny review is not satisfied because the law is neither justified by a compelling state interest nor narrowly tailored to advance that interest.[6]

¶100 In my view, the Court fails in its duty to properly undertake the necessary constitutional inquiry. The Court's over-general statements do not acknowledge the facts of the record. The Court's reliance on *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 108 S. Ct. 1319 (1988), where the United States Supreme Court rejected a challenge to the government's use of its own property for road construction and the property was deemed sacred by non-owners, provides little authority for this case and less consolation. Our Court has held that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *St. John's Lutheran Church*, 252 Mont. at 524, 830 P.2d at 1276 (quoting *Miller v. Catholic Diocese of Great Falls, Billings*, 224 Mont. 113, 117, 728 P.2d 794, 796 (1986); *Yoder*, 406 U.S. at 215, 92 S. Ct. at 1533). However, in my view, such protection has not been provided herein. Had this been the status of religious freedom in 1620, the Pilgrims may well have sailed right by.

¶101 I dissent.

/S/ JIM RICE

Justice Patricia O. Cotter and Justice Jim Nelson join in the dissenting Opinion of Justice Rice.

---

[6] The Court responds to the claim that HB 119 intrudes into the religious practices of the Colony by listing regulatory statutes that would apply to the Colony's business activities. *See* Opinion, ¶ 62. However, these statutes regulate the Hutterites' *external* activities and do not intrude into their *internal* religious practices, as do the provisions at issue here.

/S/ PATRICIA COTTER
/S/ JAMES C. NELSON